[Civ. No. 17226. Third Dist. Dec. 22, 1978.]

RITA S. MILLER et al., Plaintiffs and Appellants, v.
ANITA MILLER, as Chairperson, etc., et al.,
Defendants and Respondents.

**COUNSEL**

Hancock, Rothert & Bunshoft and Thomas M. Burton for Plaintiffs and Appellants.

Evelle J. Younger and George Deukmejian, Attorneys General, Warren J. Abbott, Assistant Attorney General, Katherine E. Stone and Marian M. Johnston, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**PARAS, J.**—In *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 209-210 [130 Cal.Rptr. 697, 551 P.2d 1], our Supreme Court ruled that ". . . at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign . . . ." Relying in part upon *Stanson*, plaintiffs challenge the expenditure of public funds by the California Commission on the Status of Women (Commission) to promote ratification of the proposed Equal Rights Amendment (ERA) to the United States Constitution. Plaintiffs appeal after the superior court granted defendants' motion for summary judgment.

In the course and as part of its presentation of the motion, the defendant Commission admitted the following:

"1. The defendant CALIFORNIA COMMISSION ON THE STATUS OF WOMEN ('COMMISSION') is a commission of the State of California recognized and existing by virtue of chapter 541 of the California Statutes of 1971. [Gov. Code, §§ 8220-8225.]

"2. Anita Miller is and has been since June, 1972 a public member and Chairperson of the Commission. Anita Miller was director of the 'Project'[1] from April 1, 1974 through March 31, 1976.

"3. The primary legislative concern of the COMMISSION in 1972 was ratification by California of the Equal Rights Amendment to the United States Constitution.

"4. The COMMISSION has coordinated efforts of the California Legislative Roundtable representing 17 major women's organizations and 153,000 California women toward ratification.

"5. The COMMISSION has disseminated its view in favor of the Amendment through the media and by the public appearance and pronouncements of its members and staff.

---

[1]The "Project" is the Equal Rights Project of the Rockefeller Foundation, which furnished a grant to the Commission "to study the societal impact of conformance to the Equal Rights Amendment." The Commission is authorized to accept such grants by Government Code section 8224 subdivision (f). Defendants assert that a special account was established for the Project, and Commission funds were never intermingled with Project funds. All work relative to the Project was paid for with Rockefeller Foundation funds. A publication known as The Equal Rights Monitor was for a time published by the Project.

"6. From and after 1973, the COMMISSION established as its highest priority the final ratification of the Equal Rights Amendment by the necessary additional states for it to become law, and pledged itself to assist *wherever possible* [italics in original], efforts in states other than California to ratify the Amendment. It also determined to develop 'public understanding' of the Equal Rights Amendment through speeches, publications and other publicity material, to analyze the societal impact of conformance of California laws to the Equal Rights Amendment.

"7. The COMMISSION by the 'Project' commissioned articles by legal and other scholars concerning the Equal Rights Amendment; that it has prepared brochures, white papers, newspaper articles, radio tapes, television spot announcements and has sponsored the formation of a National Task Force on Equal Rights Amendment conformance and conferences in various states throughout the nation, to the end of analyzing the legal and societal impact of the Equal Rights Amendment and implementing the ERA when it is ratified.

"8. Since at least August of 1974, the COMMISSION has printed a newsletter, the purpose of which in part was to gain further public support and private donations to oppose rescission of the Equal Rights Amendment in California and promote its passage in other states; that the August 1974 newsletter stated that legal authorities agree that a state cannot rescind ratification, that said newsletter urged supporters of the ERA to contribute money to the National Organization of Women, Common Cause, the League of Women Voters and other organizations to help Equal Rights Amendment ratification and to contact friends in states facing ratification.

"9. The January 1975 newsletter urged contributions and letters to seven key swing states to effect ratification.

"10. The August 1975 newsletter urged the public to attend a rally at the State Capitol Building on August 26, followed by a visit to the legislators to ask for legislation conforming California laws to the Equal Rights Amendment and to oppose rescission of California's ratification.

"11. In 1976, the COMMISSION published what it called 'the definitive work on the subject of the Equal Rights Amendment' entitled 'Impact ERA, Limitations and Possibilities;' that the book purports to show the ways in which the present legal and social structure will be affected by ratification of the Equal Rights Amendment."

The Commission thus readily acknowledges that it is openly and actively involved in the promotion nationally of ratification of the ERA (and opposition to its rescission in states which have previously ratified it) both at the legislative and the grass-roots levels. For example, it asserts in No. 8 that the Commission (not the Project) prints a newsletter, and in No. 10, that the August 1975 newsletter urged the *public* to attend a rally at the State Capitol Building and to visit legislators "to ask for *legislation* . . . and to oppose rescission of the ERA." (Italics added.) Since the Commission is maintained at public expense, part at least of such activity necessarily is paid for by and with public funds.

In addition to the admissions from the Commission itself, in opposition to defendants' motion and in support of their own countermotion for summary judgment, plaintiffs submitted voluminous records produced from the Commission's files on discovery which further documented the Commission's involvement in urging segments of the general public to contact their legislators in support of the ERA or conforming legislation. For example, attached as an exhibit to a declaration by plaintiffs' counsel, Thomas M. Burton, is the Commission's proposal to the Rockefeller Foundation seeking funding for the Project; under the heading "Involvement of Commission and/or Commissioners in ERA Ratification and Implementation," the Commission stated:

"For the past four years, adoption of an Equal Rights Amendment to the Federal Constitution has been first priority and has included the following specific efforts:

"*Congressional Passage of the ERA.* . . .

". . . . . . . . . . . . . . . . . .

"Organization and implementation of direct contact with appropriate Congressmen and Senators by hundreds of California citizens to urge ERA adoption in Congress (letter writing, telegrams, phoning coordinated to action on passage of ERA in House and Senate).

"*Ratification in California*

"1. Formation of a statewide coalition for the ERA composed of 65 organizations (list attached) to coordinate efforts for ratification.

"2. Establishment of a committee in each California legislators' district to coordinate lobbying effort for ERA."

In *Stanson* v. *Mott,* the Director of the California Department of Parks and Recreation authorized the department to spend over $5,000 of public funds to promote voter approval of a $250 million park bond issue. Invalidating such action, the Supreme Court drew a distinction between public agency "legislative lobbying," which is expressly authorized by Government Code sections 50023 and 53060.5,[2] and "election campaigning," which is not so authorized. (17 Cal.3d at p. 218.) After forcefully discussing the serious threat to First Amendment rights posed by governmental partiality in electoral matters, the court stated: "In the instant case, however, we need not resolve the serious constitutional question that would be posed by an explicit legislative authorization of the use of public funds for partisan campaigning, because the legislative provisions relied upon by defendant Mott certainly do not authorize such expenditures in the 'clear and unmistakable language' required . . . ." (17 Cal.3d at pp. 219-220.)

*Stanson* poses two issues for resolution here. First, is the Commission's promotion of ERA ratification by the legislatures of other states properly "election campaigning," or is it more akin to "legislative lobbying?" Second,[3] if the former, is it authorized by the Legislature in "clear and unmistakable language?"

Both parties rely upon *Hawke* v. *Smith* (1920) 253 U.S. 221 [64 L.Ed. 871, 40 S.Ct. 495, 10 A.L.R. 1504], which held that proposed federal constitutional amendments may not be submitted to the voters by referendum. The Commission asserts that this demonstrates that *ratification is not an electoral process.* Plaintiffs quote language from the opinion that ". . . ratification by a state of a constitutional amendment is not an act of legislation within the proper sense of the word. It is but the expression of the assent of the state to a proposed amendment." 253 U.S. at p. 229 [64 L.Ed. at p. 876].) Plaintiffs also note that a state Legislature may not amend the proposed amendment, but must simply vote yes or no. Thus, say plaintiffs, *ratification is not a legislative process* and thus not a proper object for legislative lobbying.

---

[2]These two sections apply to local governmental agencies and districts. The court pointed to no statute or decision authorizing lobbying by state agencies, but implied the existence of such authority. (See 17 Cal.3d at p. 218.) For purposes of this case we deem it to exist.

[3]A third issue of course would be constitutionality. Since we find the action unauthorized, we do not reach it.

■ Such labeling is not very helpful to us. Rather, we conclude that the real issue under *Stanson* is not the *objective* of the promotional activity but the *audience* to which it is directed. In enunciating the distinction between lobbying and electoral activities, the *Stanson* court reasoned as follows: "[W]hile public agency 'lobbying' efforts undeniably involve the use of public funds to promote causes which some members of the public may not support, one of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies. Since the legislative process contemplates that interested parties will attend legislative hearings to explain *the potential benefits or detriments* of proposed legislation, public agency lobbying, *within the limits authorized by statute (see fn. 4, ante)* in no way undermines or distorts the legislative process. By contrast, the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave to the 'free election' of the people (see Cal. Const., art. II, § 2), does present a serious threat to the integrity of the electoral process." (Italics added.) (17 Cal.3d at p. 218.)

Footnote 4 to which the court refers sets out Government Code section 50023, which provides: "The legislative body of a local agency, directly or through a representative, may attend the Legislature and Congress, and any committees thereof, and present information to aid the passage of legislation which the legislative body deems beneficial to the local agency or to prevent the passage of legislation which the legislative body deems detrimental to the local agency. The cost and expense incident thereto are proper charges against the local agency." This section limits lobbying activity to attending and presenting the public agency's viewpoint directly to the Legislature or Congress. (See 42 Ops.Cal.Atty.Gen. 25, 26 (1963), which concluded that the Tulare County Board of Supervisors was *not* authorized by section 50023 to spend county funds to mail information and recommendations on pending state welfare legislation to the registered voters of the county, because "[s]ection 50023 is restricted in scope to the presentation of information *directly* to the Legislature and Congress . . . ." (Italics in original.)) Nothing in section 50023 or similar section 53060.5 authorizes a public agency to direct its lobbying activities to the electorate itself. Thus we observe that the *Stanson* court's recognition and approval of public agency lobbying was limited to presentations directed to the Legislature and Congress.

It is one thing for a public agency to present its point of view to the Legislature. It is quite another for it to use the public treasury to finance

an appeal to the voters to lobby their Legislature in support of the agency's point of view. The latter "undermines or distorts the *legislative* process" just as clearly as "the use of the public treasury to mount an election campaign . . . [distorts] the integrity of the *electoral* process." (*Stanson, supra,* 17 Cal.3d at p. 218.) (Italics added.)

This distinction as to the audience to which the material is directed is further apparent in the *Stanson* court's discussion of the necessary information-disseminating function fulfilled by public agencies. Quoting from *Citizens to Protect Pub. Funds* v. *Board of Education* (1953) 13 N.J. 172, 180 [98 A.2d 673, 677], *Stanson* made it clear that although a public agency may not use public funds to *advocate* one side of an issue, it does not need specific legislative authorization to provide voters with " 'relevant facts to aid them in reaching an informed judgment when voting upon the proposal.' " (*Stanson,* 17 Cal.3d at p. 220.) Thus the court indicated that agency communications with the public must "provide the public with a 'fair representation' of relevant information . . . ."[4] (17 Cal.3d at p. 221.)

One of the cases cited with approval in *Stanson, Stern* v. *Kramarsky* (1975) 84 Misc.2d 447 [375 N.Y.S.2d 235], concerned the identical issue here. That case sustained a taxpayer attack against the campaign of New York's Division of Human Rights for an Equal Rights Amendment to the New York Constitution:

"The spectacle of state agencies campaigning for or against propositions or proposed constitutional amendments to be voted on by the public, albeit perhaps well-motivated, can only demean the democratic process. As a State Agency supported by public funds they cannot advocate their favored position on any issue or for any candidates, as such. So long as they are an arm of the state government they must maintain a position of neutrality and impartiality.

"It would be establishing a dangerous and untenable precedent to permit the government or any agency thereof, to use public funds to disseminate propaganda in favor of or against any issue or candidate. This may be done by totalitarian, dictatorial or autocratic governments but cannot be tolerated, directly or indirectly, in these democratic United

---

[4]The factual disputes before the court on the summary judgment motion are more than adequate to present triable issues of fact as to whether the information supplied by the Commission to the public regarding the ERA and its effect is always accurate, impartial or fair.

States of America. This is true even if the position advocated is believed to be in the best interests of our country.

"To educate, to inform, to advocate or to promote voting on any issue may be undertaken, provided it is not to persuade nor to convey favoritism, partisanship, partiality, approval or disapproval by a State agency of any issue, worthy as it may be." (375 N.Y.S.2d at p. 239.)

Federal courts and congressional committees have interpreted federal law in a similar fashion. 18 United States Code section 1913 prohibits the expenditure of governmental agency funds to influence Congress, with a proviso that ". . . this shall not prevent officers or employees of the United States . . . from communicating . . . to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business." In *Am. Public Gas Ass'n* v. *Fed. Energy Administration* (D.D.C. 1976) 408 F.Supp. 640, 642, the court held that the prohibition on using appropriated funds was directed at activity "likely to induce persons to contact their congressman," and thus was not applicable to a pamphlet published by a federal agency which, although admittedly biased, only presented certain facts and arguments and did not mention any specific legislation nor urge or request readers to communicate with members of Congress.

Recent congressional hearings on the use of Commerce Department Maritime Administration funds and personnel to support a private lobbying organization, the National Maritime Council, provide excellent background material on the difficult problem of delineating proper from improper agency lobbying. The following statements from that material are appropos to the present case: ". . . section 1913 was generally intended to prohibit the use of Government funds for public relations campaigns or other such activities which are intended to result in communications to Members of Congress and to influence them concerning specific legislation either directly, indirectly through artificially stimulated letter campaigns, or through governmental support of organizations which 'lobby' the Congress. Promotional campaigns aided or assisted by Federal funds which are directed towards economic goals or general public benefits, such as advertisements or publications designed to increase the utilization of goods or services of a particular industry or technology, or to conserve certain resources, might not come within the prohibition, then, when not directed at or concerned with particular Federal legislation or otherwise intended to influence a Member of Congress in the passage or defeat of Federal legislation.

"· . . . . . . . . . . . . . . . . . .

"The particular nature and content of a federally financed publication, advertisement, or other promotional campaign device would thus apparently be the determining factor as to a violation of the statute on a case-by-case basis. Members of the Administration or other Federal officers or employees may apparently express their views publicly on the need for certain legislation and programs. However, it appears that federally financing or aiding publications or advertisements or the like which are part of a publicity campaign advocating the passage or defeat of Federal legislation with the intention or likelihood of garnering public support to influence Members of Congress on a specific issue or piece of legislation, would be that type of prohibited activity contemplated by the statutory provision." (Hearings on IRS Administration of Tax Laws Relating to Lobbying, before a Subcom. of the House Com. on Government Operations, pt. 2, on Problems in the Relationship Between the Commerce Department's Maritime Administration and the National Maritime Council, a Private Trade Organization; etc. (July 20 and 21, 1978), pp. 340-341. See also Rep. by the Com. on Government Operations (32d Rep.) on Problems in the Relationship, etc. Union Calendar No. 908, House Rep. No. 95-1680 (Oct. 2, 1978).)

The Supreme Court of Massachusetts aptly summarized the principle. "The Commonwealth has an interest in assuring that a dissenting minority of taxpayers is not compelled to finance the expression on an election issue of views with which they disagree." (*Anderson* v. *City of Boston* (1978) — Mass. — [380 N.E.2d 628, 639].) The court footnoted its approval of an incisive passage from an advocate's brief to the effect that " 'the danger that public debate will be overwhelmed by the speech of public entities may well warrant a prophylactic rule restricting speech by government bodies to matters closely related to their official responsibilities.' " (*Id.,* fn. 18.)

The plaintiffs made an adequate showing on the summary judgment motion that the Commission's activities involve election campaigning and not merely legislative lobbying. Accordingly "clear and explicit" legislative authorization for its advocatory or promotional position on ERA is needed. We do not find it. Although the Commission is given broad powers to do anything "which may be necessary, desirable, or proper to carry out the purposes of this chapter" (Gov. Code, § 8224, subd. (b)), such broad statements were held in *Stanson* to be insufficiently " 'clear

and unmistakable' . . . ." (17 Cal.3d at pp. 219-220.) Nothing else in the statutes clearly and explicitly authorizes the Commission to urge the public to support the passage of legislative or constitutional measures. Therefore, any expenditures of public funds to marshal public support for the ERA were unauthorized, and the trial court erred in granting summary judgment.

## II

The judgment must be reversed. Apparently some of the financial support for the Commission's advocacy of the ERA to the general public came from a Rockefeller Foundation grant (see fn. 1, *ante,* p. 764). But the complaint alleges that the Commission has " . . . expended *public* funds of the State of California in order to promote and gain widespread *public* support for the controversial political views and feminist goals of the COMMISSION and its members, and *to obtain ratification* of the Equal Rights Amendment by California and by other states . . . ." This was not negated by defendants in the summary judgment motion; indeed it was impliedly admitted by them. (See *ante,* pp. 764-765.) There exists a factual issue as to the source of funding for particular communications, which cannot be resolved by summary judgment. Moreover, as above noted, the question of whether a given public communication is "informational" or "promotional" is also a factual issue for which summary judgment is inappropriate. (See *Stanson,* 17 Cal.2d at pp. 222-223.)

## III

Our conclusion makes it unnecessary to discuss other contentions of plaintiffs.

We cannot however ignore our separately concurring brother, whose polemics in support of the Commission, like those of the trial judge (whom he extensively quotes), are wholly foreign to the issue before us. Though highly esoteric and complex in its solution, the issue itself is straightforward and simple. Did the trial court overlook one or more triable issues of fact, thus falling into error? Having determined that it did, with which conclusion our brother seems to agree, we should go no further, leaving unventilated other potential issues not presented to us for decision, and our personal views. Accordingly we disavow substantially all the concurring comments, embracing only that small segment which directly relates to our topic.

Lest this adherence to judicial tradition eschewing the discussion of subject matter not before us for adjudication be now construed by some as male chauvinism, we hereby declare that like all fair-minded persons we avidly espouse the concept of equality, including equality of women to men, as embodied in the Civil Rights Act of 1964 (42 U.S.C. § 200e-2), the United States Constitution (14th Amend.), and the California Constitution (art. I, § 8). Nothing more need be said.

The judgment is reversed.

Puglia, P. J., concurred.

**REYNOSO, J.**—I concur. The concurrence, as I explain below, is a limited one.

The trial court dealt with a constitutional and statutory broadside attack on the existence and effort of the California Commission on the Status of Women. The complaint prayed, in part, "That the Court declare the COMMISSION dissolved, its acts . . . and the law establishing it null and void." None of the theories advanced by plaintiffs, with the exception I discuss below, merit more than a polite nod.[1]

The legislative purpose of the Commission was articulated by the trial court with a sensitivity toward history:

"Study, research, the gathering and dissemination of relevant information was determined to be the best initial approach. These functions have been and are being served by the Commission herein. Anyone who cannot comprehend the compelling interest involved herein is either unaware of, oblivious to or totally insensitive to the history of the treatment of women. The Legislative purpose of the statutes creating the Commission was to study and provide information on what further could be done by the Legislature to bring women to the level of enjoying equal protection under our laws. (In 1837 the desire of women for equal

---

[1] I regret the majority's failure to dispose of the other issues on appeal: (1) Does the establishment of the Commission (a) violate the separation of powers doctrine, or (b) deprive appellants of equal protection of the law, and their First Amendment rights; (2) Is the Commission's promotion of the Equal Rights Amendment authorized by Government Code section 8220 et seq.? (3) If authorized are those sections void for vagueness? In my view, these contentions have no merit and would properly be the subject of a partial summary judgment. Judicial economy requires that we dispose of those issues or give guidance to the trial court.

protection under the law was succinctly stated by an early American feminist, Sarah Grimke who said: 'I ask no favor for my sex. All I ask of our brethren is that they take their feet off our necks.')

"At the Women's Rights Convention at Seneca Falls, New York in 1848, a Declaration of Principles was adopted paraphrasing the Declaration of Independence, it held 'these truths to be self-evident; that all men and women are created equal.'

"The Fifteenth Amendment to the U.S. Constitution, enacted in 1869, guaranteed universal suffrage for men. It was not until 1920 that women gained the right to vote by the enactment of the Nineteenth Amendment. While this was a giant step forward, compared to the status of women under the Code of Hammurabi, wherein women were legally chattels of men, it did not abate any of the discrimination practiced against women in employment, pay, jury service, right to a separate domicile, capacity to enter into binding agreements, capacity to sue and be sued, change in citizenship upon marriage to an alien, change of name upon marriage and many other areas wherein a person's sex made the sole difference in the treatment he or she would receive under the law of the United States and of California. Legislatively and judicially many of these discriminations have been and are being abolished." Under the California Constitution, a legislative classification based on sex is suspect. (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351].) The creation of the Commission on the Status of Women was a legislative recognition that a compelling interest existed in improving the legal, social, political and economic status of women.

There is only one issue which, in my view, presents a triable issue of fact on the present state of the record. That issue is whether the Commission has been involved in (1) lobbying (which is permitted), (2) "promotion" in a political campaign absent express legislative authorization (which is proscribed under *Stanson*), or (3) activity which may be described as somewhere between lobbying and direct political activity during a campaign. The stipulation of facts entered into by the parties is vague regarding the issue we consider. Accordingly, as is explained below, the moving party, defendant Commission, has failed to make the type of showing required. (4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 181, p. 2833.) The stipulation inferentially raises an issue of fact as to the precise nature of the activity conducted by the Commission and whether that activity is proper or proscribed. It may

be that when all the facts and evidence are before the trial court, the facts will fit neatly within that activity which is not prohibited or that which is.

I do not share my brethrens' apparent suggestion that conducting grass roots lobbying campaigns in support of Equal Rights Amendment is per se proscribed. Lobbying activity invariably means that the lobbyist (here the Commission) will be in contact with constituents to know their views as well with legislators. One of the legislative purposes of the Commission is to "encourage women's organizations . . . to institute local self-help activities designed to meet women's educational, employment, and related needs . . ." (Gov. Code, § 8225, subd. (d).) Thus, the Commission is mandated to be in helpful communication with the grass roots organizations. If, however, the facts as they are developed in the trial show that the Commission was involved in "election campaigning" with respect to candidates which support Equal Rights Amendment, or otherwise directly involved in such campaigns, then we do have activity which is proscribed by *Stanson* v. *Mott.* It must be apparent that I take strong exception to my colleagues' apparent conclusion that plaintiffs have already made an adequate showing on a summary judgment that the Commission's activities involve election campaigning.

With respect to promotional activity, I agree that the real issue is not the objective but the audience to which it is directed. At times, however, the distinction may be more apparent than real. Thus, for example, the Commission is certainly authorized to take a stand in favor of Equal Rights Amendment and to issue a press release to that effect. The principal audience presumably is the legislators; surely a secondary audience must be the media and through the media the electorate. I cite this example as one which in my view is not proscribed. Further, whether the activity is "promotional" in an electioneering sense or promotional in terms of fulfilling a legislative mandate is not self-evident. Each challenged activity must be scrutinized.

On the one hand, the law seeks to protect the public from a "big brother" approach by government which seeks to propagandize on public issues. On the other hand, we must provide the governmental entities the freedoms to carry out their legislative missions. In the case of the Commission on the Status of Women the mission may be controversial and not pleasing to the plaintiffs. We, as a court, must nonetheless not interfere with that legislative mandate.

Because of the drastic nature of a summary judgment and the importance of safeguarding the adverse party's right to a trial, the moving party must make a strong showing. The courts will construe the moving party's affidavits strictly and the counteraffidavits liberally. (See 4 Witkin, Cal. Procedure, *supra*, § 181, p. 2833.) Conflict of facts (and presumably factual inferences to be drawn from a stipulation) must be resolved in favor of the nonmoving party. (See *Chesney* v. *Gresham* (1976) 64 Cal.App.3d 120, 125 [134 Cal.Rptr. 238].) Since all inferences are against the moving party, I conclude that the stipulation does raise a sufficient factual issue to go to trial only on this narrow issue: Is any of the Commission activity proscribed as being improper electioneering? The remedy, of course, may be no more than a declaratory judgment.

A petition for a rehearing was denied January 18, 1979. Reynoso, J., was of the opinion that the petition should be granted. Respondents' petition for a hearing by the Supreme Court was denied March 22, 1979. Bird, C. J., Tobriner, J., and Newman, J., were of the opinion that the petition should be granted.