OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

| | |
|---|---|
| OPINION : | No. 89-1202 |
| of : | |
| : | AUGUST 30, 1990 |
| JOHN K. VAN DE KAMP : | |
| Attorney General : | |
| : | |
| CLAYTON P. ROCHE : | |
| Deputy Attorney General : | |
| : | |

THE HONORABLE VICTOR J. WESTMAN, COUNTY COUNSEL, CONTRA COSTA COUNTY, has requested an opinion on the following questions:

1. Can public funds of a city, county or district be lawfully used to draft an initiative or referendum measure which will be circulated for signatures among the voters with respect to legislation of another city, county or district?

2. Can public funds of a city, county or district be lawfully used to gather signatures for an initiative or referendum measure with respect to legislation of another city, county or district? Is there a distinction in law between a state measure and a local measure regarding gathering signatures? Is there a distinction in law between the use of public funds regarding gathering signatures for a referendum measure versus an initiative measure?

3. Can public funds be used to promote an initiative or referendum measure that has qualified for the ballot? Can a public agency or official use public funds to provide educational information to the public about a ballot measure? If so, how is a distinction made between "educational materials" and "campaign literature?"

CONCLUSIONS

1. Public funds of a city, county or district may lawfully be used to draft an initiative or referendum measure which will be circulated among the voters with respect to legislation of another city, county or district.

2. Public funds of a city, county or district may not be lawfully used to gather signatures for an initiative or referendum measure with respect to legislation of another city, county or district. There is no distinction in law to be drawn between a state measure or a local measure in this respect. Nor is there a distinction in law to be drawn between a referendum measure versus an initiative measure.

1.                                                                 89-1202

3. Public funds cannot be used to promote an initiative or referendum measure that has qualified for the ballot, at least in the absence of clear and explicit legislative authorization. A public agency or official can use public funds to provide educational information to the public about a ballot measure. No hard and fast rule be set forth to distinguish between "campaign literature" and "educational materials" which will govern each case. Circumstances such as the style, tenor or timing of the publication may be determinative.

ANALYSIS

Under the provision of article IV, section 1 of the California Constitution "[t]he legislative power of the State is vested in the California Legislature . . . but the people reserve to themselves the power of initiative and referendum." Accordingly, with respect to state legislation, the people may either propose laws to be voted upon by them (the power of initiative) or they may reject by their vote laws which the Legislature has enacted (the power of referendum). [See Cal. Const., art. II, §§ 8-10, and generally, Elec. Code, §§ 3500-3524].

Additionally, under the provisions of article II, section 11 of the California Constitution, "initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide. . . ." (See, generally, Elec. Code, §§ 3700-4061)[1]

Finally, as to most special districts which are authorized to enact ordinances, the Legislature has provided for the initiative and referendum procedures for such districts. (See Elec. Code, §§ 5150-5201).

In this request for our opinion our focus in questions one and two is upon initiative or referendum measures which are to be drafted by a city, county or special district and circulated among the voters for signatures with respect to legislation of another city, county or district.

Accordingly, with respect to questions one and two we do not consider any measures which might appear on the ballot on advisory matters, but which do not seek to propose legislation (e.g., the myriad "straw votes" once prevalent concerning the withdrawal of troops from Southeast Asia.) Such "straw votes" do not fall within the reserved powers of the initiative or referendum. (See *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687, 708-715; 56 Ops.Cal.Atty.Gen. 61 (1973).)

Additionally, with respect to questions one and two we are not concerned with what this office denominated many years ago as a "voluntary referendum" at the local level. (See 31 Ops.Cal.Atty.Gen. 100 (1958).) Under this procedure the legislative body of a city, county or district drafts proposed legislation on its own motion, without any petition being presented to it by the voters, and submits the proposed legislation to the voters for their approval or rejection. (See Elec. Code, §§ 3750, 4017, 5201.) Thus, the drafting of the proposed legislation is authorized by statute, it involves the agency's own legislation, and there is no circulation of any petition for the signature of the voters.

With respect to question three, that is whether a local agency may support a ballot measure or provide information concerning the measure to the voters, we also consider ballot measures in their broader sense, that is any measure properly submitted to the voters, whether by

---

[1]Chartered cities may also provide for initiative and referendum by charter. (Cal. Const., art. II, § 11; Elec. Code, § 4061.)

initiative, referendum or by the state legislature or a local legislative body. (See Elec. Code, § 38: "`Measure' means any constitutional amendment or other proposition submitted to a popular vote at any election.")

Procedurally, at both the state and local level an initiative follows three basic steps, which are: 1) proposed legislation is drafted and placed in petition form for circulation among the voters of the jurisdiction for their signature; 2) the measure is filed with the appropriate state or local election officials and then circulated among the voters in an attempt to obtain the number of signatures of voters legally required to qualify the measure for placement on the ballot; and 3) if the required number of signatures are obtained, the measure is placed on the election ballot for the electorate to either adopt or reject the proposed legislation by their vote. (See generally, Elec. Code, § 3500 et seq.)

Likewise, procedurally at both the state and local level, a referendum measure, that is, one whereby the voters either approve or reject legislation which has just been enacted by their legislative body, also follows the same three basic steps: 1) the measure, which sets forth the question whether the specified legislation shall take effect, is drafted; 2) the measure is filed and then circulated among the voters in an attempt to obtain the number of signatures legally required to place the measure on the ballot; and 3) if it qualifies for the ballot the electors vote on the measure to determine if the legislation shall or shall not take effect. (*Ibid*.)

In this request for our opinion we are asked whether local agencies may use public funds to draft initiative and referendum measures as to other local agencies and, if so, what restrictions may apply to the use of such funds.

Additionally, we are asked 1) whether local agencies may use public funds to gather signatures for such initiative and referendum measures and 2) whether there is a distinction in law to be drawn between an initiative measure and a referendum measure, or a state or local measure in this respect.

Finally, we are asked whether a local agency may promote an initiative or referendum measure which has qualified for the ballot, or provide "educational information" as opposed to "campaign literature" to the public concerning ballot measures generally.

We conclude that local agencies, that is, cities, counties or districts may use public funds to draft an initiative or referendum measure as to other local agencies. The measure, however, must serve the legitimate governmental interests of the drafting local agency. Furthermore, public funds may not be used to endeavor to secure the support of the electorate on only one side of the issue.

We conclude, however, that local agencies, that is, cities, counties and districts, may not use public funds to gather signatures for an initiative or referendum measure and that there is no distinction to be made in this respect as to an initiative or a referendum measure, or a state or local measure.

Finally, we conclude that public funds may not be used to promote an initiative or referendum measure, absent clear legislative authorization. However, a public agency or official may provide to the public "educational information" about a ballot measure if such information is neutral in its content and presentation.

We reach these conclusions primarily upon the authority of three California cases decided over the last decade and a half, that is *Stanson* v. *Mott* (1976) 17 Cal.3d 206, *Miller* v.

*Miller* (1978) 87 Cal.App.3d 762, and *League of Women Voters* v. *Countywide Crim. Justice Coordinating Com.* (1988) 203 Cal.App.3d 529. We will discuss the salient features of each case and then apply them to the specific questions asked.

1. *Stanson* v. *Mott*

*Stanson* v. *Mott*, *supra*, 17 Cal.3d 206, presented the question whether the State Director of Beaches and Parks was authorized to expend public funds in support of certain state bond measures to be voted upon by the people. Such bonds were to provide funds to enhance state and local recreational facilities.

The California Supreme Court, relying heavily upon its early decision in *Mines* v. *Del Valle* (1927) 201 Cal.273, concluded that the Director of Beaches and Parks lacked such authority since it could not find it in the statutes. The Court set forth the basic rule that ". . . at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign. . . ." (17 Cal.3d at pp. 209-210.) The Court, after reviewing cases from other jurisdictions, noted that ". . . every court which has addressed the issue to date has found the use of public funds for partisan campaign purposes improper, either on the ground that such use was not explicitly authorized . . . or on the broader ground that such expenditures are never appropriate. . . ." The Court further concluded that:

"Underlying this uniform judicial reluctance to sanction the use of public funds for election campaigns rests an implicit recognition that such expenditures raise potentially serious constitutional questions. A fundamental precept of this nation's democratic electoral process is that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions. A principal danger feared by our country's founders lay in the possibility that the holders of governmental authority would use official power improperly to perpetuate themselves, or their allies, in office (see, e.g., Madison, The Federalist Papers, Nos. 52, 53; 10 Richardson, Messages and Papers of the Presidents (1899) pp. 98-99 (President Jefferson)); the selective use of public funds in election campaigns, of course, raises the specter of just such an improper distortion of the democratic electoral process." (17 Cal.3d at p. 217.)

The Court also held that there was no distinction to be drawn between candidates and ballot measures in this respect.

The Court did, however, note the various statutory provisions permitting legislative lobbying, the duty of elected and appointed officials to implement current administrative policies by suggesting legislation, and the distinction between such processes and "election campaigning." The Court thus stated:

"Moreover, the suggested analogy between election campaigning and legislative lobbying ignores important distinctions between the two activities. To begin with, California statutes draw a clear distinction between the two matters; while various provisions authorize public expenditures for appropriate legislative lobbying activities (see, e.g., Gov. Code, §§ 50023, 53060.5, 82039, 86300, subd. (a); cf. Cal. Const., art. IV, § 15), no similar provision sanctions the use of public funds in election campaigns. (Cf. Ed. Code, § 1073 (quoted in fn. 7, post).)

"More fundamentally, while public agency `lobbying' efforts undeniably involve the use of public funds to promote causes which some members of the public

may not support, <u>one of the primary functions of elected and appointed executive officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies</u>.  Since the legislative process contemplates that interested parties will attend legislative hearings to explain the potential benefits or detriments of proposed legislation, public agency lobbying, within the limits authorized by statue (see fn. 4, ante), in no way undermines or distorts the legislative process.  By contrast, the use of the public treasury to mount an election campaign which attempts to influence the resolution of issues which our Constitution leave to the `free election' of the people (see Cal. Const., art. II, § 2) does present a serious threat to the integrity of the electoral process."  (17 Cal.3d. at p. 218, footnotes omitted, emphasis added.)

Finally, the Court closed with the caveat that the general powers granted to the Director of Parks and Recreation did "provide the department with authority to spend funds budgeted for informational purposes [regarding the agency's activities and long range needs and plans], to provide the public with a `fair presentation' of relevant information relating to a park bond issue on which the agency has labored." (17 Cal.3d at p. 221.)

2. *Miller* v. *Miller*

The case *Miller* v. *Miller* (1978) 87 Cal.App.3d 762 (Miller I)[2] followed shortly after the Court's decision in *Mott*.

In *Miller I* the issue was whether the California Commission on the Status of Women had the power to campaign both in this state and elsewhere for the ratification of the Equal Rights Amendment (ERA).  These activities included lobbying "both at the legislative and the grass-roots level."  The "grass-roots" level included urging the general public to contact their legislators in support of the ERA.  (87 Cal.App.3d at p. 766.)

The Commission took the position that ratification of the ERA would not involve the electoral process, since the matter could not be submitted to the voters; accordingly, its lobbying activities could not be said to interfere with the electoral process; and hence its lobbying activities were legally permitted.  Plaintiffs urged, however, that the Commission was not legally authorized to do <u>any</u> lobbying.  They urged that since state legislatures could do nothing more than vote "yes" or "no" on the ERA ratification, such would not involve the legislative process so as to authorize lobbying.

The Court, however, stated that "[s]uch labeling is not very helpful to us.  Rather, we conclude that the real issue under *Stanson* is not the <u>objective</u> of the promotional activity but the <u>audience</u> to which it is directed" (87 Cal.App.3d at p. 768.)  The Court noted that "[i]t is one thing for a public agency to present its view to the Legislature.  It is quite another for it to use the public treasury to finance an appeal to the voters to lobby their Legislature in support of the agency's point of view.  The latter `undermines and distorts the legislative process' just as clearly as `the use of the public treasury to mount an election campaign. . . [distorts] the integrity of the <u>electoral</u> process.' (*Stanson*, *supra*, 17 Cal.3d at p. 218.)  (Italics added)."  (87 Cal.App.3d at pp. 768-769.)

[2]*Miller* v. *California Com. On Status of Women* (1984) 151 Cal.App.3d 693 (Miller II) was decided after legislative action was taken to modify the result in Miller I as to the lack of authority of the state agency to take the action it took.  *Miller* v. *California Com. On Status of Women* (1985) 176 Cal.App.3d 454 concluded the litigation, settling matters of costs.

The Court concluded, however, that under the facts presented and the "audience test" the plaintiffs had made an adequate showing on the summary judgment motion that the Commission's activities involved election campaigning and not mere legislative lobbying for which no "clear and explicit" legislative authority existed. It therefore held that "any expenditures of public funds to marshal public support for the ERA were unauthorized." (87 Cal.App.3d at p. 772.)

### 3. *League of Women Voters* v. *Countywide Crim Justice Coordinating Com.*

*League of Women Voters* v. *Countywide Crim. Justice Coordinating Com.*, *supra*, 203 Cal.App.3d 529 is the last of the triad of California cases relevant to the questions presented herein. In this case the issue presented was the legality of activities taken by the County of Los Angeles and its officials 1) to draft a proposed state initiative measure to provide for certain procedural changes in the criminal justice system relating to juries in criminal cases; 2) to find a sponsor or sponsors for such statewide initiative measure; and 3) to indicate support for such measure through speeches and otherwise. In resolving the issues presented, the court drew heavily upon Miller I and *Stanson* v. *Mott*, applying the concepts discussed therein to its facts.

With respect to the county's activities in drafting the proposed statewide initiative and finding sponsors, the court found no difficulty in implying such power from 1) the legitimate county interest in the subject matter 2) the broad autonomous legislative and fiscal powers possessed by the county and 3) the fact that the drafting stage would not involve partisan campaign activity. The Court rejected arguments of the plaintiffs that drafting the initiative and seeking out sponsors was inherently partisan in nature and that the "audience" was necessarily the electorate.

Accordingly, relying upon *Stanson* v. *Mott*, and the discussion therein regarding the power of a public agency to lobby before other public bodies (including section 50023 of the Government Code) the court then noted that that case had stated that "one of the primary functions of elected and appointed officials is, of course, to devise legislative proposals to attempt to implement the current administration's policies." (203 Cal.App.3d at p. 544.)[3] Relying then upon a series of New Jersey cases the court concluded that "[it] is logical to conclude the power to devise legislative proposals to serve a local entity's perceived interests implies the power to draft proposed legislation." (203 Cal.App.3d at p. 547.) The court then took this concept one step further and concluded that "if the interests a local government seeks to serve are legitimate but the Legislature has proven disinterested, there appears to be no logical reason not to imply from the indispensable

---

[3]Section 50023 of the Government Code provides:

"The legislative body of a local agency, directly or through a representative, may attend the Legislature and Congress, and any committees thereof, and present information to aid the passage of legislation which the legislative body deems beneficial to the local agency or to prevent the passage of legislation which the legislative body deems detrimental to the local agency. The legislative body of a local agency, directly or through a representative, may meet with representatives of executive or administrative agencies of state, federal, or local government to present information requesting action which the legislative body deems beneficial to, or opposing action deemed detrimental to, such local agency. The cost and expense incident thereto are proper charges against the local agency."

Accordingly, a local agency may not only lobby before Congress and the State Legislature, but may also "lobby" other local agencies as to what is beneficial or detrimental to them.

power to draft proposed legislation the power to draft a proposed initiative measure in the hope a sympathetic private supporter will forward the case and the public will prove more receptive." (263 Cal.App.3d at p. 548). The Court distinguished between drafting a proposed initiative, which it found did <u>not</u> fall within the rubric of partisan campaigning, and urging a particular vote on a matter which has already qualified for the ballot. The court in summary held:

> "Clearly, prior to and through the drafting stage of a proposed initiative, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; there is as yet nothing to proceed to either of those stages. The audience at which these activities are directed is not the electorate per se, but only potentially interested private citizens; there is no attempt to persuade or influence <u>any vote</u>. (*Miller I*, *supra*, 87 Cal.App.3d at p. 768.) It follows those activities cannot reasonably be construed as partisan campaigning. Accordingly, we hold the development and drafting of a proposed initiative was not akin to partisan campaign activity, but was more closely akin to the proper exercise of legislative authority." (203 Cal.App.3d at p. 550.)

In this respect, however, we would point out that it is not every piece of proposed legislation which a city, county or district may legitimately draft. For example, a city could not draft a entire new county general plan to be submitted to the voters of the county. The proposed draft would still, in the words of the New Jersey Court, *supra*, have to serve <u>the city's "perceived interests", that is, relate to the city's governmental matters</u>. Otherwise, the drafting of the measure, which uses city tax dollars, would constitute a waste of the public funds of the city. However, were the city to draft a proposed amendment to the general plan on a matter which impacted upon the city (<u>e.g</u>, the location of a garbage dump in nearby unincorporated territory) then we believe it could be said to serve the city's "perceived interests" and serve a public purpose of the city. The following reasoning of the court in *League of Women Voters* v. *Countywide Crim. Justice Coordination Com.*, *supra*, 203 Cal.App.3d 529, 554 would then be pertinent:

> "There is no authority which provides useful guidance on this subject, other than the principle enunciated, *ante*, that the nature of the public purpose primarily is a matter of legislative discretion which will not be disturbed if it is supported by a reasonable basis. . . ."

In short, we believe a city, county or district would have wide discretion as to matters which legitimately affect it, but such discretion is not without boundaries.

### 4.  Use of Public Funds To Draft Initiative or Referendum Measure

We now proceed to the first question presented for resolution herein, that is, whether public funds of a city county or district may be used to draft an initiative or referendum measure with respect to legislation of another city, county or district.

We conclude that *League of Women Voters* v. *Countywide Crim. Justice Coordinating Com.*, *supra*, 203 Cal.App.3d 529, which is clear authority for local agencies to draft a statewide initiative in which they have a legitimate interest, in principal also constitutes authority in a proper case for a local agency to draft a local initiative measure, directed to the electorate of another local agency. For example, as already noted a city has a legitimate interest as a city in many county legislative matters, such as a county general plan insofar as it may impact the city. As noted by the court in *League of Women Voters*, which reasoning would be applicable in principle whether directed to state legislative matter or the legislative matters of another local agency:

7.

"Nonetheless, if the interests a local governmental entity seeks to serve are legitimate but the Legislature has proven disinterested, there appears to be no logical reason not to imply from the indisputable power to draft proposed legislation the power to draft a proposed initiative measure in the hope a sympathetic private supporter will forward the cause and the public will prove more receptive. (2) `"The determination of what constitutes a public purpose is primarily a matter for legislative discretion [citations], which is not disturbed by the courts so long as it has a reasonable basis."' (*Shean* v. *Edmonds* (1948) 89 Cal.App.2d 315, 323 [200 P.2d 879], quoting from *County of Alameda* v. *Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]; accord, *Board of Supervisors* v. *Dolan* (1975) 45 Cal.App.3d 237, 243 [119 Cal.Rptr. 347].)" (203 Cal.App.3d at p. 548.)

Additionally, we believe there is no logical distinction to be drawn between drafting an initiative measure and drafting a referendum measure. Both relate to the legislative process, albeit at difference stages. However, *Stanson* v. *Mott* and its progeny still teach that absent clear and explicit authority "a government may not `take sides' in election contests." (17 Cal.3d at p. 217). However under *League of Women Voters* "sides" are not taken at the drafting stage or even at the stage where sponsors for the measure are sought. The court in that case, discussing the New Jersey cases previously alluded to, stated: "*Reilly* v. *Ozzard* (1960) 33 N.J. 529 [166 A.2D 360, 89 A.L.R. 2d 612] holds that a local government entity has the right to seek <u>or oppose legislation</u> affecting its interests and may draft legislation to accomplish that end." (203 Cal.App.3d at p. 547, emphasis added.) Although a referendum petition itself does not propose "legislation", we believe it travels with similar credentials in the context of the rules enumerated in *Stanson* v. *Mott* and its progeny since it relates to the final stage of the legislative process, <u>and opposes legislation</u>.

We therefore conclude that a local agency under the reasoning of the case law, and by analogy to it lobbying powers, (see, e.g., sec. 50023 of the Government Code, *supra*.) may draft an initiative or referendum petition. This conclusion however carries the caveats found in the case law to the effect that the matter must be of legitimate interest to the drafting public agency and that public funds may not be used to endeavor to secure the support of only one side of the issue. To be of "legitimate interest" to the local agency we believe that the legislation at which the measure is directed must effect the local agency <u>as a local agency, or affect the citizens of the local agency in their status as citizens of that local agency</u>. Mere general interest of the electorate in a matter, (e.g., in "pro-life" or "pro-choice" matters), would not be a sufficient or a legitimate interest.

    5. Securing Signatures On An
       Initiative or Referendum Petition

The second question presented for resolution herein is whether a city, county or district may use public funds to gather signatures for an initiative or referendum measure. We conclude they may not do so and that there is no difference between a state or local measure in the this respect.

In *League of Women Voters* v. *Countywide Crim. Justice Coordinating Com.*, *supra*, 203 Cal.App.3d 529 the court concluded that the drafting of an initiative petition and seeking out possible sponsors for the measure by the county did not cross the prohibited line drawn in *Stanson* v. *Mott* as to using public funds to "take sides" in partisan campaigns.

In doing so the Court noted that the decided case law on the subject in California and elsewhere had involved measures which had already qualified for the ballot. In justification of its decision that the drafting and seeking out of sponsors would not constitute the prohibited "taking sides", the court concluded first as to the drafting stage as follows:

"Clearly, prior to and through the drafting stage of a proposed initiative, the action is not taken to attempt to influence voters either to qualify or to pass an initiative measure; there is as yet nothing to proceed to either of those stages. The audience at which these activities are directed is not the electorate per se, but only potentially interested private citizens; there is no attempt to persuade or influence <u>any vote</u>. (*Miller I, supra*, 87 Cal.App.3d at p. 768.) It follows those activities cannot reasonably be construed as partisan campaigning. Accordingly, we hold the development and drafting of a proposed initiative was not akin to partisan campaign activity, but was more closely akin to the proper exercise of legislative authority." (203 Cal.App.3d at p. 550.)

As to the seeking out sponsors the court noted that arguments could be presented on both sides of the issue of "taking sides." Thus the court stated:

"Whether CCJCC legitimately could direct the task force to identify and secure a willing sponsor is somewhat more problematical. The power to direct the preparation of a draft proposed initiative does not necessarily imply the power to identify and secure a willing proponent to sponsor it thenceforward. On the one hand, it can be argued the power to draft the proposed initiative is essentially useless without the power to seek out a willing proponent and the latter power thus must be implied. On the other hand, it can be argued this brings CCJCC, as an arm of the board of supervisors, too close to impermissible publicly funded political activity, in that it necessarily involves some degree of advocacy or promotion. The logical force of the latter view depends largely on the approach the task force employed in identifying a willing proponent. Unfortunately, the record sheds no light on that subject." (203 Cal.App.3d p. 553.)

The Court then reviewed what little evidence was available on this point, acknowledged that the preliminary drafting activities of the county "may have benefited those private parties who eventually became the sponsors and official proponents of the draft proposed initiative," and then concluded as follows:

". . . On balance, we conclude the power to draft the proposed initiative necessarily implies the power to seek out a willing proponent. We do not perceive the activities of identifying and securing such a proponent for a draft initiative as entailing any degree of public advocacy or promotion, directed at the electorate, of the single viewpoint embodied in the measure.

"To the extent CCJCC had authority to direct the performance of the above acts, it is clear the county's elected officers had authority to participate in CCJCC and its subcommittees and to perform a broad spectrum of tasks at public expense. It is only at the point the activities of CCJCC and it subcommittees cross the line of improper advocacy <u>or promotion of a single view in an effort to influence the electorate</u> that the actions of elected officers or their deputies, undertaken at public expense, likewise would become improper." (203 Cal.App.3d at p. 554; emphasis added.)

In our view, securing signatures at public expense for a proposed initiative would "cross the line of improper advocacy or promotion of a single point of view in an effort to influence the electorate." Procedurally, once a proposed initiative or referendum is filed either at the state or local level, it is the <u>proponents</u>' task to qualify the measure for the ballot by obtaining the requisite number of signatures and filing the petition. (See, generally, Elec. Code, §§ 3502, 3513, 3522, 3702-

3706, 4002, 4005, 4008, 4053, 5152, 5200.) Accordingly, using public funds to obtain signatures would aid the proponents by essentially financing <u>their</u> partisan task. As such, the funds would be used to advocate the position taken by the proponents, that is, that the measure they support should not only qualify for the ballot, <u>but should be adopted by the electorate</u>. This we believe is the clear message that is given to the electorate when signatures on a petition are sought. The point of neutrality would be passed. This the public agency cannot do without clear and explicit authorization under *Stanson* v. *Mott*.

Accordingly, public funds of a city, county or district may not be used to gather signatures for an initiative or referendum measure. There would be no legal distinction between an initiative or referendum. Both would fall within the rubric of "taking sides" in partisan campaigns. Nor would there be any difference between a state measure and a local measure in this respect, since the forbidden line of advocacy of a single point of view would be crossed.

### 6. Promotion of Ballot Measures and Providing Educational Materials

The third question presented is whether public funds can be used to promote an initiative or referendum measure that has qualified for the ballot; whether a public agency or official can use public funds to provide educational information to the public about a ballot measure; and how a distinction is to be made between "educational materials" and "campaign literature."

These questions are answered by reference to the Court's language in *Stanson* v. *Mott*, *supra*, 17 Cal.3d 206. As will be recalled the Court in that case set forth the basic rule that ". . . at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign." (*Id.*, at pp. 209-210.) Accordingly, absent clear legislation authorization, a public agency may not use public funds to promote an initiative or referendum measure.

As will also be recalled, however, *Stanson* v. *Mott* concluded with the caveat that a public agency may provide informational materials to voters concerning ballot measures. In this respect, the Courts guidelines and reasoning are relevant concerning the distinction between what may be termed "educational materials" and "campaign literature." The Court stated (17 Cal.3d at pp. 221-222):

> "Problems may arise, or course, in attempting to distinguish improper `campaign' expenditures from proper `informational' activities. With respect to some activities, the distinction is rather clear; thus, the use of public funds to purchase such items as bumper stickers, posters, advertising `floats,' or television and radio `spots' unquestionably constitutes improper campaign activity (see, e.g., *Mines* v. *Del Valle*, *supra*, 201 Cal. at p. 276; *Porter* v. *Tiffany*, *supra*, 502 P.2d at p. 1386), as does the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure. (See 51 Ops.Cal.Atty.Gen. 190, 194 (1968); *Stern* v. *Kramarsky*, *supra*, 375 N.Y.S.2d 235.) On the other hand, it is generally accepted that a public agency pursues a proper `informational' role when it simply gives a `fair presentation of the facts' in response to a citizen's request for information (see *Citizens to Protect Pub. Funds* v. *Board of Education*, *supra*, 98 A.2d 673, 677; *Stern* v. *Kramarsky*, *supra*, 375 N.Y.S.2d 235, 239-240; 51 Ops.Cal.Atty.Gen. 190, 193 (1968) ) or, when requested by a public or private organization, it authorizes an agency employee to present the department's view of a ballot proposal at a meeting of such organization. (See Ed. Code, § 1073; cf. *Citizens to Protect Pub. Funds* v. *Board of Education*, *supra*, 98 A.2d 673-677.)

"Frequently, however, the line between unauthorized campaign expenditures and authorized informational activities is not so clear. Thus, while past cases indicate that public agencies may generally publish a `fair presentation of facts' relevant to an election matter, in a number of instances publicly financed brochures or newspaper advertisements which have purported to contain only relevant factual information, and which have refrained from exhorting voters to `Vote Yes,' have nevertheless been found to constitute improper campaign literature. (See 35 Ops.Cal.Atty.Gen. 112 (1960); 51 Ops.Cal.Atty.Gen. 190 (1968); cf. 42 Ops.Cal.Atty.Gen. 25, 27 (1964).) In such cases, the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case." (Fn. omitted.)

Accordingly, we conclude that public funds cannot be used to promote an initiative or referendum measure that has qualified for the ballot, at least in the absence of clear and explicit legislative authorization. A public agency or official can, however, use public funds to provide educational information to the public about a ballot measure. No hard and fast rule can be set forth to distinguish between "campaign literature" and "educational materials." Each case will be determined on its own facts. Circumstances such as the style, tenor or timing of the publication may aid in making that determination.[4]

\* \* \* \*

---

[4]In so concluding we note that the California cases reserve to individual public officers their right to speak out in partisan matters so long as there is no improper expenditure of public funds by such officials. Likewise, a local legislative body may go on record at a public meeting as being in favor of or opposed to a particular measure. (*League of Women Voters* v. *Countywide Crim. Justice Com.*, *supra*, 203 Cal.App.3d 529, 555-556, 560.)