[No. A126056. First Dist., Div. Three. Oct. 21, 2011.]

PENINSULA GUARDIANS, INC., Plaintiff and Respondent, v.
PENINSULA HEALTH CARE DISTRICT, Defendant and Appellant.

COUNSEL

Archer Norris, Douglas C. Straus and Mark A. Olson for Defendant and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Joseph M. Quinn and Keith D. Kessler for Plaintiff and Respondent.

OPINION

**JENKINS, J.**—Peninsula Guardians, Inc. (plaintiff), an incorporated public interest group, filed an amended complaint alleging defendant Peninsula Health Care District (District) made campaign expenditures prohibited by *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*), in connection with a ballot measure that authorized the construction of a new hospital. In a prior appeal, we affirmed the trial court's dismissal of plaintiff's other claims related to the hospital project, but remanded to allow plaintiff to amend its complaint to assert a *Stanson* claim. (See *Peninsula Guardians, Inc. v. Peninsula Health Care Dist.* (2008) 168 Cal.App.4th 75 [85 Cal.Rptr.3d 253] [certified for partial publication].) Subsequently, our Supreme Court decided *Vargas v. City of Salinas* (2009) 46 Cal.4th 1 [92 Cal.Rptr.3d 286, 205 P.3d 207] (*Vargas*), in which it reaffirmed the *Stanson* rule that government entities generally may not use public funds to pay for campaign activities, but may use such funds to make available informational materials relating to an election. (See *Vargas*, pp. 24–25, 33–34; *Stanson*, pp. 219–222.)

District filed a special motion to strike plaintiff's amended complaint under Code of Civil Procedure section 425.16,[1] the anti-SLAPP (strategic lawsuit against public participation) statute. The trial court denied the motion, concluding there was a probability plaintiff would prevail on its claim that District engaged in unlawful campaign activity by producing and mailing certain materials relating to the ballot measure. District appeals, contending that (1) as a matter of law, the challenged publications were proper informational materials under *Vargas* and (2) the materials were protected by the First Amendment to the United States Constitution. We conclude the materials were proper under *Vargas* as a matter of law, and hence reverse the trial court's order denying District's anti-SLAPP motion. We do not reach District's First Amendment argument.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise stated.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. *The Proposed New Hospital*

In 1985, District leased its existing acute care hospital facility to Mills-Peninsula Health Service (MPHS), with the lease to expire in January 2015 and ownership and control of the hospital to revert to District at that time. During the term of that lease, the State of California adopted strict seismic standards for acute care hospitals. Implementation of the seismic standards meant the existing hospital would require substantial modifications. Based on engineering studies, District and MPHS concluded compliance with the seismic standards would be better achieved by construction of a new hospital facility rather than a retrofit of the existing facility. To this end, in 2005, the parties entered (1) a "Restructured Relationship Pre-Closing Agreement" (Pre-Closing Agreement) and (2) a set of other interrelated agreements (collectively termed the Definitive Agreements), which included a "Master Agreement" and a ground lease. These agreements provided for MPHS to develop, construct, and operate a new general, acute care hospital on land leased from District.

Under the Pre-Closing Agreement, District was obligated to hold an election on a ballot measure asking voters to approve District's entry into the Master Agreement with MPHS. The Pre-Closing Agreement stated: "Both parties, at their own expense and within the limitations and parameters imposed by any law . . . that governs the parties' respective political activities, . . . shall reasonably support the Ballot Measure and use reasonable efforts to obtain Voter Approval."[2] As we discuss in more detail below, in August 2006 voters approved a ballot measure (Measure V) authorizing District's entry into the Master Agreement with MPHS.

B. *District's Public Communications About the Proposed Hospital*

During the years preceding the passage of Measure V, District communi-cated with District residents about the need for a new hospital, the planning process, and the negotiations and ultimate agreements with MPHS. At a May 2002 meeting of District's board of directors (Board), a director noted the "need to educate [the] community and proposed initiating a newsletter and/or web site" for District. The Board again discussed the need for "community

---

[2] In its opening brief on appeal, District states it submitted the question to the voters because it "recognized that an election and pre-election hearings might be statutorily required [under Health and Safety Code section 32121, subdivision (p)] and concluded that not holding an election might precipitate a legal challenge to the new hospital lease/construction plan." Health and Safety Code section 32121, subdivision (p) requires voter approval of certain transfers of assets by a health care district. (See Health & Saf. Code, § 32121, subd. (p)(1), (2)(C).)

outreach" at a December 2002 meeting, voting to retain consultant Singer Associates (Singer) to assist with development of a newsletter and Web site.

At a February 2003 Board meeting, the communications oversight committee reported that the Web site was in progress and the first newsletter was ready to be sent. The spring 2003 newsletter included a letter from the Board explaining that the existing hospital did not meet new seismic safety standards, and noting that both District and MPHS believed building a new hospital would be a better approach than retrofitting the old one. In the newsletter, the Board stated MPHS had presented a proposal to rebuild the hospital, which District was considering. The newsletter announced a "series of town hall meetings and study sessions" to discuss the proposal, and invited public input. The newsletter included articles about District's history and activities, including distribution of health care grants and oversight of the hospital; the need for a new hospital; MPHS's proposal; and the process for approving the project.

In the second edition of the newsletter (winter 2003), the Board outlined reports and presentations it had received from its architectural, health care, financial and economic consultants, addressing different aspects of MPHS's proposal. The consultants made their presentations at public Board meetings, and the presentations were available on District's Web site. The newsletter identified issues that had arisen from negotiations and from public meetings held to provide information and obtain public input. The newsletter announced that, after it negotiated revisions to MPHS's proposal, it would host a series of public meetings on the revised proposal.

District's third newsletter (fall 2004) summarized a tentative agreement negotiated with MPHS. The tentative agreement, reflected in a letter of intent, included revisions based on the consultants' reports and public input. Among other terms, the letter of intent provided MPHS would build and operate a privately funded hospital on property leased from District under a 50-year ground lease with MPHS paying $1.5 million per year in rent, adjusted for inflation. MPHS would transfer the facility to District upon expiration of the lease. The letter of intent also placed restrictions on the termination of core services, required MPHS to comply with its charity care policy, and specified penalties and enforcement rights. The newsletter announced there would be a series of special Board meetings to permit the public to review and comment on the proposal. The newsletter explained that, if approved by the Board, the proposal would be submitted to the voters. In addition to providing this information about the hospital proposal, the newsletter included an article about District's grant program.

### C. *The Board's Approval of the Definitive Agreements*

In July 2005, drafts of the Definitive Agreements were released to the public, accompanied by media briefings and news releases. District mailed a postcard inviting residents to attend any of five public meetings in July and August 2005 about the agreements. The postcard noted the agreements were available in public libraries and on District's Web site. District also publicized the meetings with a press release and newspaper advertisements. After the five public meetings, the agreements were revised to reflect public input.

At its August 30, 2005 meeting, the Board, after hearing public comments, approved the Definitive Agreements.

### D. *Measure V*

At a special meeting on May 17, 2006, the Board approved modifications to the agreements. The Board then approved a resolution calling for a mail-in election on a ballot measure (Measure V) allowing voters to accept or reject the new hospital plan, and setting an election date of August 29, 2006. Measure V stated: "Shall the Peninsula Health Care District ('District') authorize construction by Mills-Peninsula Health Services ('MPHS') of a new earthquake safe state-of-the-art acute care hospital on District land and a new long-term lease of District land with MPHS for the annual rent of $1,500,000 (adjusted for cost of living increases), in accordance with the District's Master Agreement with MPHS dated October 17, 2005, and Resolution 2005-2, adopted August 30, 2005?"

A member of the Board submitted a ballot argument in favor of Measure V. Neither plaintiff nor anyone else submitted a ballot argument opposing the measure.

### E. *District's Communications About Measure V*

During a meeting on May 25, 2006, the Board discussed the preparation of a newsletter that would "focus and recap the terms of the agreement between the District and [MPHS] on the building of the new hospital and the lease arrangements, as well as the mail ballot." There would be a "public information campaign," including postcards providing information about the ballot. Directors and members of the public discussed the need to provide the public with information about the ballot measure. At a June 29, 2006 meeting, the directors, a Singer consultant, and members of the public further discussed the planned newsletter and postcards about the ballot measure.

In July and August 2006, District mailed the newsletter and postcards about Measure V.[3] District spent District funds in connection with the preparation and mailing of these materials, which District sent to approximately 44,000 registered voter households. Plaintiff contends District's expenditure of public funds to produce and send these four mailings was unlawful under *Stanson* and *Vargas*.[4]

District sent its summer 2006 newsletter, entitled "Community Update," on or about July 17, 2006. The newsletter states it is "A Publication of the Peninsula Health Care District," and is denominated "Volume 4." (The prior editions of District's newsletter were identified as vols. 1, 2, and 3.) The newsletter states: "Dear District Resident, [¶] The [District] Board is proud to announce that after many years of study and planning, we are ready to present our agreement to build a new community hospital to the District voters in a special mail-in ballot election this August. [¶] Last fall, the District Board unanimously approved an agreement with [MPHS], the current operator of Peninsula Medical Center, to build a new $488 million modern medical campus on District land with no new taxes. As part of this new lease, MPHS will pay $1.5 million a year to the District in rent for the use of that land for the 50-year term of the lease, after which time the hospital will be transferred back to the District. The District will reimburse MPHS with the book value of the new hospital, a substantial discount, at the time of this transfer. [¶] Because the current hospital does not meet newly adopted, state-mandated seismic safety requirements, which must be met by 2013, the District Board is eager to present this agreement to the District voters for approval in order to avoid further cost escalation and to keep construction on budget and on schedule. If the new seismic standards are not met by the deadline and a new medical facility is not built, the Peninsula Medical Center would be forced to shut down, greatly limiting access to quality health care in our community. [¶] We would like to thank all of you who took the time to attend our special Board meetings which were held throughout the District and to those of you who provided feedback on the draft agreement this past fall. [¶] The negotiations have been extensive and with your input and participation, we have negotiated the best possible agreement for the District. We will get a new hospital, and a framework for providing for the health care needs of the people of the District for generations to come."

The remainder of the summer 2006 newsletter devotes sections to various aspects of Measure V, including the details of the Master Agreement (p. 2); the construction timeline and the hospital's expected completion in early 2010 (p. 3); the reason District needs a new hospital, viz., the new seismic

---

[3] Copies of the newsletter and postcards are set forth in appendices A through D.

[4] Plaintiff does not challenge the legality of any of District's other communications about the hospital project or the election.

requirements for acute care medical facilities (p. 4); how the mail-in ballot works, including when voters should expect to receive their mail-in ballots (p. 6); and the "new hospital for the next century," setting out the features and facilities included in the new hospital campus (p. 5).

The section of the newsletter summarizing the details of the agreement states the Board is "proud of the final terms of the agreement," and describes it as a "fair deal." The newsletter also discloses concessions District made in the negotiations to secure MPHS's guarantee that it would complete the project. The newsletter states: "The agreement allowed MPHS to defer or eliminate items up to 15% of the total projected cost to stay within budget. MPHS provided the District with a list of such items, which fell far below the 15% reduction in scope, and included the potential removal of conference rooms, business offices, three operating rooms, the fitness center and helipad, in addition to the removal of some exterior finishes."

During the runup to the election, District sent three postcard mailers (approximately six inches by 10 inches in size) to voters concerning Measure V. One is headed "What is Measure V?," and was sent on or about July 27, 2006. It explains that District and MPHS have reached an agreement for the construction of a new hospital on District land, and that the current hospital will be forced to close down if it does not comply with new seismic standards. Under the subheading "Measure V Will Ensure," the mailer lists four bullet points on the key terms of the agreement between District and MPHS. The four points (which are also stated in the newsletter's longer summary of the agreement) are that MPHS will build a new hospital meeting seismic standards with no new taxes; District will lease the site for the hospital to MPHS at rent of $1.5 million per year for the 50-year term; District "will improve its oversight over hospital operations with its required approval of the removal of any core services"; and District will have the option to acquire the hospital at the end of the lease at book value.

A second mailer is headed "How the Mail-In Ballot Works." It tells voters there will be no polling places and that once voters receive their ballots in the mail they should fill them in and return them by August 29, 2006, either by mail or to the 24-hour drop box outside the election office. It also restates the four bullet points listed in the first mailer. A third mailer is headed "Don't Forget to Vote." It too reminds voters that ballots must be returned by August 29, 2006, and restates the four bullet points. The second and third mailers apparently were sent in early August.[5]

---

[5] District, relying on invoices for printing and production of the postcards, states they were mailed on or about August 4 and 7, 2006. Plaintiff submitted a declaration from a District resident stating she received the postcards on August 14 and 17.

On August 29, 2006, Measure V was approved with 92.82 percent of the votes cast in favor of the measure.

### F. *Plaintiff's Lawsuit and Prior Appellate Proceedings*

Plaintiff filed suit, contending (1) District exceeded its powers under the Health and Safety Code by entering the Definitive Agreements and (2) District's expenditure of public funds in connection with Measure V violated Government Code section 54964. (See *Peninsula Guardians, Inc. v. Peninsula Health Care Dist.* (Sept. 30, 2008, A118303) [nonpub. pt. of partially pub. opn.].) In its claim under Government Code section 54964, plaintiff asserted District improperly spent public funds to send the summer 2006 "Community Update" newsletter and the three subsequent postcards. (See *Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* 168 Cal.App.4th at pp. 80–81; *Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* A118303 [nonpub. pt. of partially pub. opn.].) The trial court dismissed the complaint after sustaining demurrers to plaintiff's Health and Safety Code claims, granting summary judgment as to plaintiff's Government Code section 54964 claim, and denying plaintiff's motion for relief from summary judgment under section 473. (See *Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* 168 Cal.App.4th at p. 78; *Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* A118303 [nonpub. pt. of partially pub. opn.].)

On appeal, we affirmed the trial court's orders sustaining the demurrers on the Health and Safety Code claims and granting summary judgment on the Government Code section 54964 claim. (*Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* 168 Cal.App.4th at pp. 77–78, 82–87; *Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* A118303 [nonpub. pt. of partially pub. opn.].) As to the Government Code section 54964 claim, we held that provision prohibits only express advocacy, and we concluded as a matter of law that District's election materials "do not constitute 'communications that expressly advocate the approval' of Measure V." (*Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* A118303 [nonpub. pt. of partially pub. opn.].)

However, we reversed the trial court's section 473 ruling, vacated the judgment and remanded for plaintiff to amend its complaint to state a claim on the basis that *Stanson* imposes broader restrictions on government speech than does Government Code section 54964.[6] (*Peninsula Guardians, Inc. v.*

---

[6] We expressed no view on the merits of such a claim, but noted the issue was presented in *Vargas,* which was then pending before the Supreme Court. (*Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* A118303 [nonpub. pt. of partially pub. opn.].) In its subsequent decision in *Vargas,* the Supreme Court held that the "express advocacy" standard

*Peninsula Health Care Dist., supra,* 168 Cal.App.4th at pp. 78, 88; *Peninsula Guardians, Inc. v. Peninsula Health Care Dist., supra,* A118303 [nonpub. pt. of partially pub. opn.].)

### G. District's Anti-SLAPP Motion

In March 2009, plaintiff filed its third amended complaint (complaint) against District, asserting a single cause of action under *Stanson.* The Supreme Court issued its decision in *Vargas* in April 2009. (*Vargas, supra,* 46 Cal.4th at p. 1.) District filed an amended motion to strike the complaint under the anti-SLAPP statute. District contended the materials it sent before the passage of Measure V constituted proper informational materials, rather than improper campaign materials. Plaintiff opposed the motion, arguing the style, tenor and timing of the mailers established they were improper campaign materials.

The trial court issued a tentative ruling denying District's motion on the basis that plaintiff had shown a probability it would prevail on its *Stanson* claim. The trial court stated: "The postcards and newsletter consist almost entirely of statements of fact, however, the colorful graphics, unrelated photographs, and statements of opinion ([i.e.,] 'proud', 'fair', 'best', 'substantial discount', 'no new taxes') do not state objective facts. This evidence, if favorably viewed by the trial court, could result in a finding that the materials in question were unlawful campaign expenditures as opposed to legitimate informational expenditures."

At the hearing on the motion, District's counsel contended the propriety of the materials under *Stanson* and *Vargas* was a question of law to be decided by the court. District's counsel noted the Supreme Court in *Vargas* had resolved this issue as a matter of law. (See *Vargas, supra,* 46 Cal.4th at pp. 8–9.) The trial court, however, appeared to treat the propriety of District's materials as a question of fact. The court stated that one is "not to hold [*Vargas*] up as the exemplar, so to speak"; one must instead "take each case and each situation on its facts." The court emphasized it was not determining the materials were *improper* as a matter of law, but was only determining there was a likelihood plaintiff could prevail at trial, if the trier of fact gave plaintiff's evidence "full credibility." At the conclusion of the hearing, the trial court adopted its tentative ruling denying District's motion.

set forth in Government Code section 54964 did not displace the broader constitutional limitations on the use of public funds for partisan campaign activity set forth in *Stanson.* (*Vargas, supra,* 46 Cal.4th at pp. 27–34.)

The trial court subsequently entered a written order denying the motion. District timely appealed (see §§ 425.16, subd. (i), 904.1, subd. (a)(13)).

## II. DISCUSSION

### A. *The Anti-SLAPP Framework*

■ Resolving an anti-SLAPP motion is "[a] two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim. . . ." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Rulings on these issues are subject to de novo appellate review. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 [39 Cal.Rptr.3d 516, 128 P.3d 713].)

Plaintiff conceded in the trial court that District satisfied the first prong of the anti-SLAPP test, i.e., the conduct and materials plaintiff challenged in its *Stanson* claim constitute "protected activity" under section 425.16. (See *Vargas, supra*, 46 Cal.4th at p. 19 [city's public statements about ballot measure constituted " 'protected activity' " within meaning of first step of anti-SLAPP analysis].) Plaintiff therefore had the burden, under the second step of the anti-SLAPP analysis, to establish a prima facie case on the merits. (*Ibid.*)

■ " 'In order to establish a probability of prevailing on the claim (§ 425.16, subd. (b)(1)), a plaintiff responding to an anti-SLAPP motion must " 'state[] and substantiate[] a legally sufficient claim.' " [Citation.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should

grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]' " (*Vargas, supra,* 46 Cal.4th at pp. 19–20.)

### B. *The* Stanson *Rule and the* Vargas *Decision*

In *Stanson*, a taxpayer sued the director of a state agency, challenging the agency's expenditures promoting a bond measure. (*Stanson, supra,* 17 Cal.3d at pp. 209–210.) After the trial court sustained a demurrer, the Supreme Court reversed, holding that, "at least in the absence of clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign . . . ." (*Id.* at pp. 209–210, 222–223.) The court stated, however, that an agency may "disseminate information" to the public, such as by providing a " 'fair presentation' " of relevant information about a ballot measure. (*Id.* at pp. 220–221.) Our Supreme Court applied *Stanson* in *Keller v. State Bar* (1989) 47 Cal.3d 1152, 1170–1172 [255 Cal.Rptr. 542, 767 P.2d 1020] (*Keller*), reversed on other grounds in *Keller v. State Bar of California* (1990) 496 U.S. 1, 17 [110 L.Ed.2d 1, 110 S.Ct. 2228], holding that an "educational packet" sent by the State Bar to local bar associations and other groups prior to a judicial retention election constituted "prohibited election campaigning."

In *Vargas*, the Supreme Court reaffirmed the *Stanson* rule. (*Vargas, supra,* 46 Cal.4th at pp. 24–25, 33–34.) The *Vargas* court considered the propriety of expenditures by the City of Salinas for communications about a local ballot initiative (Measure O) that would have repealed the city's utility tax, and about cuts in services the city planned to implement if Measure O passed. (46 Cal.4th at pp. 7, 12–13, 35.) The communications included information posted on the city's Web site, a one-page document made available at the city clerk's office and at public libraries, and articles in the city's newsletter. (*Id.* at p. 35.) After the trial court granted the city's motion to strike the plaintiffs' complaint under the anti-SLAPP statute, the Court of Appeal and the Supreme Court affirmed. (*Id.* at pp. 8–9.)

The *Vargas* court reaffirmed that "the campaign activity/informational material dichotomy" announced in *Stanson* is "the appropriate standard for distinguishing the type of activities that presumptively may not be paid for by public funds, from those activities that presumptively may be financed from public funds." (*Vargas, supra,* 46 Cal.4th at p. 34.) Under this standard, certain government actions constitute improper campaign activity, including " 'the use of public funds to purchase such items as bumper stickers, posters,

advertising "floats," or television and radio "spots," ' " and " 'the dissemination, at public expense, of campaign literature prepared by private proponents or opponents of a ballot measure.' " (*Id.* at p. 24.) On the other hand, a public agency acts in a proper informational role when it provides a " ' "fair presentation of the facts" in response to a citizen's request for information,' " or authorizes an agency employee to present the department's view of a ballot proposal at a meeting of a public or private organization upon that organization's request. (*Id.* at pp. 24–25.) When an activity does not fall clearly into either category, the court must consider " '*such factors as the style, tenor and timing of the publication; no hard and fast rule governs every case.*' " (*Id.* at p. 25, fn. omitted.)

The *Vargas* court concluded the city's challenged communications "as a matter of law do not constitute improper campaign materials or activities under the standard set forth in *Stanson*." (*Vargas, supra,* 46 Cal.4th at pp. 8–9, 37–39.) The court initially rejected the plaintiffs' argument that the city's communications should be viewed as improper campaign materials because they "failed to include the views expressed by the proponents of Measure O in opposition to the action taken by the city council—views that challenged the necessity and wisdom of the proposed cutbacks in city services." (*Id.* at p. 35.) Relying on a passage in *Stanson*, the *Vargas* plaintiffs argued that, by failing to set forth the competing views of Measure O's proponents, the city's communications improperly " 'took sides' " on the ballot measure and therefore constituted improper campaign activity. (*Vargas, supra,* 46 Cal.4th at p. 35.) The *Vargas* court concluded, however, that the "statement [in *Stanson*] that the government 'may not "take sides" in election contests' [citation] properly must be understood as singling out a public entity's 'use of the public treasury *to mount an election campaign*' [citation] as the potentially constitutionally suspect conduct, rather than as precluding a public entity from analytically evaluating a proposed ballot measure and publicly expressing an opinion as to its merits." (*Vargas, supra,* 46 Cal.4th at p. 36.)

The *Vargas* court held the city did not engage in campaign activity by making information about potential service cuts resulting from Measure O available on the city's Web site and at the city clerk's office and public libraries. (*Vargas, supra,* 46 Cal.4th at pp. 37–38.) The court then considered articles in the city's fall 2002 newsletter about the proposed service reductions that the city council had voted to implement if Measure O passed. (46 Cal.4th at pp. 38–39.) The newsletter was sent on or before October 1, 2002; the election was held on November 5, 2002. (*Id.* at pp. 12–13.) The court stated: "Although under some circumstances the mailing of material relating

to a ballot measure to a large number of potential voters shortly before an upcoming election unquestionably would constitute campaign activity that may not properly be paid for by public funds, a number of factors support the conclusion that the City's mailing of the newsletter here at issue constituted informational rather than campaign activity." (*Id.* at p. 38.)

The court first found it significant that the newsletter was a regular edition of the city's quarterly newsletter, "rather than a special edition created and sent to would-be voters, specifically because of the upcoming election regarding Measure O." (*Vargas, supra,* 46 Cal.4th at p. 38.) The court next noted that the city council's July 16, 2002 resolution—identifying service cuts that would be implemented if Measure O were adopted—"quite clearly was an obvious and natural subject to be reported upon in a city's regular quarterly newsletter, and the style and tenor of the publication in question was entirely consistent with an ordinary municipal newsletter and readily distinguishable from traditional campaign material." (46 Cal.4th at pp. 38–39.) Although some of the articles in the newsletter "at times convey[ed] the [city] departments' views of the importance" of the programs to be cut if Measure O passed, the articles "were moderate in tone and did not exhort voters with regard to how they should vote." (46 Cal.4th at p. 39.) Moreover, an article answering frequently asked questions about the utility tax provided information "in an objective and nonpartisan manner." (*Ibid.*) The court found the content of the newsletter was thus distinguishable from a "blatantly partisan, publicly financed agency newsletter" found improper in a New York case (*id.* at p. 39 & fn. 20, citing *Schulz v. State of New York* (1995) 86 N.Y.2d 225 [630 N.Y.S.2d 978, 654 N.E.2d 1226]), and the type of "promotional campaign brochure" mailed by the Solano Transportation Improvement Authority in connection with a local transportation measure (*Vargas, supra,* 46 Cal.4th at p. 39 & fn. 21).

Summarizing its conclusion, the *Vargas* court noted "a variety of factors" contributed to the conclusion that the city's challenged actions were "more properly characterized as providing information than as campaigning: (1) the information conveyed generally involved past and present facts, such as how the original [utility tax] was enacted, what proportion of the budget was produced by the tax, and how the city council had voted to modify the budget in the event Measure O were to pass; (2) the communications avoided argumentative or inflammatory rhetoric and did not urge voters to vote in a particular manner or to take other actions in support of or in opposition to the measure; and (3) the information provided and the manner in which it was disseminated were consistent with established practice regarding use of the Web site and regular circulation of the city's official newsletter." (*Vargas, supra,* 46 Cal.4th at p. 40.)

### C. *The Propriety of District's Materials May Be Determined as a Matter of Law*

District argues the trial court should have determined whether District's materials constituted informational or campaign materials as a matter of law. Plaintiff contends this question is a factual issue, stating "if the record demonstrates that a reasonable trier of fact could ultimately find that the District's publications amount to campaign activity, then the trial court's order denying the anti-SLAPP motion must be affirmed."

■ Case law does not preclude deciding this issue as a matter of law. As District notes and as plaintiff concedes, the Supreme Court in *Vargas* determined "as a matter of law," in the context of an anti-SLAPP motion, that the challenged communications were proper informational activities rather than improper campaign activities. (See *Vargas, supra,* 46 Cal.4th at pp. 8–9, 34–35, 37–40; see also *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1233–1235, 1238–1241 [84 Cal.Rptr.3d 714] (*SBCAG*) [in context of anti-SLAPP motion, court determined plaintiff could not establish agency expenditures were unlawful].)

The cases cited by plaintiff on this point—*Stanson*; *Miller v. Miller* (1978) 87 Cal.App.3d 762, 772 [151 Cal.Rptr. 197] (*Miller*); and *DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 263, 270–271 [104 Cal.Rptr.3d 93] (*DiQuisto*)—do not establish that evaluation of the *Stanson* factors always presents a question of fact. In *Stanson* (which was resolved at the demurrer stage), the plaintiff alleged the agency director authorized the dissemination of " 'promotional' " materials. (*Stanson, supra,* 17 Cal.3d at p. 222.) The Supreme Court stated, "If plaintiff can establish these allegations at trial, he will have demonstrated that defendant did indeed authorize the improper expenditure of public funds . . . ." (*Id.* at pp. 222–223.) The *Stanson* court did not expressly hold a court may not determine whether a communication is campaign activity in a pretrial evidentiary proceeding (such as a summary judgment or anti-SLAPP motion).

In *Miller*, the appellate court (the Third Dist.) reversed an order granting summary judgment for the defendant agency on a *Stanson* claim. (*Miller, supra,* 87 Cal.App.3d at pp. 764–767, 772.) The *Miller* court, citing *Stanson*, stated "the question of whether a given public communication is 'informational' or 'promotional' is . . . a factual issue for which summary judgment is inappropriate." (*Miller, supra,* 87 Cal.App.3d at p. 772.) In light of *Vargas*, we respectfully disagree with the statement in *Miller* that this question *cannot* be resolved in a pretrial summary proceeding.

In *DiQuisto*, the trial court determined after a bench trial that certain actions by county officials did not involve the improper use of public funds. (*DiQuisto, supra*, 181 Cal.App.4th at p. 249.) The appellate court (the Sixth Dist.), citing *Stanson* and *Miller*, held the substantial evidence rule governed the issue of whether the challenged actions were campaign or informational activities. (*DiQuisto, supra*, 181 Cal.App.4th at p. 263; see also *id.* at pp. 270–271.) The *DiQuisto* court did not hold this determination always presents a question of fact that cannot be resolved as a matter of law prior to trial.

To resolve the issue presented in this case, we must evaluate plaintiff's *Stanson* claim using the second prong of the anti-SLAPP framework. We must determine whether plaintiff has met its burden to demonstrate a probability of prevailing on its claim (see *Vargas, supra*, 46 Cal.4th at pp. 19–20; *Equilon Enterprises v. Consumer Cause, Inc., supra*, 29 Cal.4th at p. 67), including establishing the unlawfulness of District's activities (see *SBCAG, supra*, 167 Cal.App.4th at pp. 1238–1239). As a matter of law, plaintiff has not met this burden.

### D. *District's Materials*

#### 1. *District Did Not Have Explicit Legislative Authorization to Conduct Campaign Activities*

District does not contend any statute or ordinance clearly and unmistakably granted it explicit authority to spend public funds for *campaign activities* relating to Measure V.[7] (See *Vargas, supra*, 46 Cal.4th at pp. 34–35.) The propriety of District's expenditures in connection with the four challenged mailers thus "turns upon whether the activities fall within the category of informational activities that may be funded through . . . general appropriations or, instead, constitute campaign activities that may not be paid for by public funds in the absence of such explicit authorization." (See *ibid.*)

#### 2. *The Content, Style, Tenor and Timing of District's Mailers Establish They are Informational as a Matter of Law.*

The parties agree District's newsletter and postcards do not fall within the *Stanson* categories of (1) typical campaign activities (such as bumper stickers, posters, advertising floats, or television and radio spots) or (2) clearly proper informational activities (such as providing information

---

[7] District argues only that certain provisions of the Health and Safety Code "impliedly" authorized the expenditure of District funds on " 'informational' " speech about Measure V. Plaintiff does not appear to dispute that District had at least implied authority to spend District funds on informational speech about Measure V.

about a ballot measure in response to a request). (See *Stanson, supra,* 17 Cal.3d at pp. 221–222; *Vargas, supra,* 46 Cal.4th at p. 35.) Accordingly, consistent with the Supreme Court's approach in *Vargas,* we must analyze the materials by considering a variety of factors, including their content, style, tenor and timing. (See *Stanson, supra,* 17 Cal.3d at p. 222; *Vargas, supra,* 46 Cal.4th at pp. 33–34, 35–40.) ██ In doing so, we reject District's assertion that *Vargas* created a "safe harbor" for any communication by a public entity about the merits of a ballot measure "so long as the manner is not unduly inflammatory or argumentative and the means are not blatant campaign activities." The *Vargas* court did not hold these are the only relevant factors, and did not state it was creating a "safe harbor" for certain types of communications.

██ In considering the *Stanson* factors, we evaluate District's materials "from the perspective of an objective observer." (*Vargas, supra,* 46 Cal.4th at p. 38.) We consider individual statements in the context of the entire newsletter or postcard in which they appear. (See *DiQuisto, supra,* 181 Cal.App.4th at p. 271 [entire communication must be considered].)

### a. *Content*

District's materials, like the materials discussed in *Vargas,* are primarily factual and informative. In *Vargas,* the court noted the information conveyed in the Salinas materials "generally involved past and present facts, such as how the original UUT [(utility users tax)] was enacted, what proportion of the budget was produced by the tax, and how the city council had voted to modify the budget in the event Measure O were to pass." (*Vargas, supra,* 46 Cal.4th at p. 40.) Some of the articles in the Salinas newsletter discussed the potential cuts to services and programs in more detail. (*Id.* at pp. 12–13, 38–39, 48, 50–52.) For example, an article addressing planned cuts to police services noted the narcotics and vice unit would be eliminated. (*Id.* at p. 51.) The article included a photograph of a methamphetamine lab, with the caption: "Methamphetamine lab. The proposed elimination of the Narcotics and Vice Unit will hamper Police Department's ability to promote the City Council's #1 goal of maintaining a safe and peaceful community." (*Ibid.*) The same article, noting the school crossing guard program would be eliminated, included a photograph of a crossing guard and students, with the caption: "Students at 27 Salinas schools will lose the benefit of supervised street crossing as a result of the repeal of the Utility Users Tax." (*Ibid.*) The article stated that, according to the Salinas police chief, "each of the programs to be eliminated or reduced significantly impact Salinas' 'community policing philosophy' and the Department's ability to tailor services to meet specific community needs." (*Ibid.*) Another article, addressing cuts to fire department services, noted the hazardous materials control/response program would be

eliminated, and stated this "[e]liminates a first line defense against Bio/Chemical terrorism." (*Id.* at p. 52.) These statements in the newsletter about the negative effects of a repeal of the utility users tax did not prevent the Supreme Court from concluding the newsletter was proper informational material as a matter of law. Instead, the *Vargas* court stated these articles, "although at times conveying the departments' views of the importance of [the] programs [that would be cut], were moderate in tone and did not exhort voters with regard to how they should vote." (*Id.* at p. 39.)

Like the Salinas materials, District's mailers generally involve past and present facts. For example, District's newsletter includes articles about the background of District and the existing hospital, the adoption of strict seismic standards for acute care hospitals, District's decision to seek to build a new hospital rather than retrofitting the existing one, and the details of the agreement reached with MPHS. In the course of explaining that agreement, the newsletter outlines the planned construction timeline for the proposed new hospital, as well as the services and facilities the hospital will provide. Finally, District's newsletter includes one page about the election: one-half of that page explains how the mail-in ballot works; the other half describes the election, and makes clear that voters will make the final decision as to whether the new hospital is approved. The newsletter states, "District residents will be voting on the new hospital plan submitted by MPHS to replace Peninsula Medical Center in Burlingame." In bolder lettering it states: "*If* the District voters approve Measure V in a special August election, construction on the new hospital to replace Peninsula Medical Center will begin in September." (Italics added.) By providing information about the election and the proposed new hospital, District's newsletter informs residents about what will occur if Measure V passes, just as the Salinas newsletter informed residents about what would occur if Measure O passed. (See *Vargas, supra*, 46 Cal.4th at pp. 12–13, 38–39, 48, 50–52.)

The postcards also provide information about the agreement and the upcoming election. One explains how the mail-in ballot works, one explains what Measure V is about, and one is a reminder to vote in the election. Each postcard also includes the same four bullet points about the key terms of the agreement.

Although District's mailers at times convey District's views as to the importance of the proposed new hospital, the mailers, like the newsletter in *Vargas*, are moderate in tone. (See *Vargas, supra*, 46 Cal.4th at p. 39.) For example, while District's newsletter lists the key terms of the agreement and the services to be provided by the proposed new hospital, it does not include emotional or inflammatory warnings about the negative consequences for District residents if the hospital is not approved. Plaintiff concedes the tenor

of District's materials "is not inflammatory." Moreover, the limited positive characterizations in District's mailers, such as stating District is "proud" of the agreement, which is a "fair deal" and includes the "best possible terms," are moderate in tone, especially when they are considered in the context of publications that (as the trial court noted in its tentative ruling) consist almost entirely of statements of fact.

### b. *Visual Style*

Plaintiff contends the "visual style" of District's materials is "political," because they include "sophisticated graphics, punchy headlines and colored quotes over bullet-pointed text." To the extent plaintiff argues these features give District's materials a somewhat different appearance than the newsletter at issue in *Vargas*, we agree. (See *Vargas, supra*, 46 Cal.4th at pp. 48–55.) But we note District's prior newsletters—which were issued before Measure V was placed on the ballot, and which plaintiff does not contend are campaign materials—also included colored graphics, photographs, and bullet-pointed text.

 Plaintiff emphasizes the inclusion in the newsletter and postcards of "stock" photographs "of happy families and smiling, trustworthy doctors." Plaintiff argues these photographs serve no informational function. District responds that use of the photographs, like the graphics and other visual features of the publications, were methods of getting the reader's attention—the materials "were prepared in an attractive manner by competent professional writers so that people would read them." Making the publications "attractive" and readable so more people would read the information in them is consistent with the legitimate dissemination of information about the hospital project and Measure V. We note the Salinas newsletter included photographs of a methamphetamine lab and a school crossing guard with students, apparently to illustrate the importance of some of the programs that would be cut if the utility tax were repealed.[8] (*Vargas, supra*, 46 Cal.4th at p. 51.)

### c. *Verbal Style and Tenor*

The Supreme Court in *Vargas* noted the Salinas communications "avoided argumentative or inflammatory rhetoric and did not urge voters to vote in a

---

[8] Plaintiff notes that, according to Board minutes, a Singer consultant suggested deferring distribution of the newsletter "until after the June 6th statewide election in order to avoid the significant traffic of political mailings at this time." Plaintiff suggests this passage shows the consultant viewed the newsletter as a campaign publication. But this argument based on the consultant's alleged subjective views is foreclosed by *Vargas*, which provides a court should consider the materials "from the perspective of an objective observer." (*Vargas, supra*, 46 Cal.4th at p. 38.)

particular manner or to take other actions in support of or in opposition to the measure." (*Vargas, supra*, 46 Cal.4th at pp. 39–40.) As noted above, District's communications are similarly moderate in tone. They do not expressly urge voters to vote for or support Measure V.

Plaintiff nonetheless argues the verbal style and "emotive, one-sided" tenor of District's mailings "are those of positive political ads." Plaintiff focuses in part on the publications' use of the pronouns " 'we' " and " 'you,' " which plaintiff says were part of an effort to "enlist [voters] in the District's cause." For example, the newsletter states: "[W]ith your input and participation, we have negotiated the best possible agreement for the District," and includes the heading, "Why Do We Need a New Hospital?" But District's use of these terms (rather than adhering strictly to a third person journalistic style) do not establish the publications were part of a political campaign. Rather, this language is consistent with District's ongoing style of communication with residents (some of whom had participated in the public meetings and hearings accompanying District's extensive negotiations with MPHS). District's prior newsletters use similar language. For example, the spring 2003 newsletter states: "We look forward to hearing your thoughts and concerns throughout this process as we all work toward securing a solid foundation for the future of health care in this district." The winter 2003 newsletter again addresses residents directly, stating: "Thank you for your input as we continue the process of determining the future of the Peninsula Medical Center and the Peninsula Health Care District." The fall 2004 newsletter tells residents: "We look forward to your participation as we move towards securing a final agreement that will allow us to rebuild this facility and better serve our community."

Plaintiff also argues District's publications are improper because they "include express value judgments and opinions." Plaintiff identifies a few phrases in the six-page newsletter that express such judgments. For example, the newsletter states the Board, with public input and participation, has "negotiated the best possible agreement for the District." The newsletter's summary of the agreement similarly states it is a "fair deal" that includes the "best possible terms to build the new community hospital on District land with no new taxes," and says the Board is "proud of the final terms of the agreement," which have "greatly benefited from the public's response." These limited, moderate statements (in the context of substantial factual information) simply reflect District's views about the merits of the proposed agreement with MPHS, just as passages in the Salinas newsletter reflected the city departments' views of the importance of certain municipal programs. (See *Vargas, supra*, 46 Cal.4th at p. 39.) The circumstance that District was understood to have a view on the merits of Measure V—based on its years of planning and negotiations, and its consideration of consultants' reports and

public input—was not improper.[9] (*Ibid.*; accord, *DiQuisto, supra,* 181 Cal.App.4th at p. 265; *Fleming v. Superior Court* (2010) 191 Cal.App.4th 73, 94, 96 [119 Cal.Rptr.3d 275] (*Fleming*).)

In a related argument, plaintiff asserts the content of the newsletter and postcards, while not "affirmatively false," is "relentlessly one-sided," providing information about the need for a new hospital and the prospective benefits of the agreement with MPHS, but failing to highlight potential drawbacks of approving the agreement. But, as the *Vargas* court emphasized, a government communication is not improper because it fails to include opposing parties' views. (See *Vargas, supra,* 46 Cal.4th at pp. 35–36.)

Both parties cite the California Supreme Court's decision in *Keller* in support of their arguments as to the tenor of District's publications. District notes the *Keller* court's statement that the packet sent by the State Bar contained a speech by the Bar president that included some "quite strident" passages. (*Keller, supra,* 47 Cal.3d at p. 1171.) District's materials, in contrast, are not inflammatory or argumentative. (See *Vargas, supra,* 46 Cal.4th at p. 40.) As plaintiff notes, however, the *Keller* court did not focus only on the stridency of some passages in the speech, but considered the material in the packet as a whole, much of which was "basically informative and factual, but without claim of impartiality." (*Keller, supra,* 47 Cal.3d at p. 1172.) But, contrary to plaintiff's argument, District's communications differ significantly from those in *Keller.* The material in *Keller* was "the kind of material which a state election committee distributes to local committees to aid them in the campaign," and included "such practical tools as a form letter to groups which might host a speaker," as well as a sample speech. (*Ibid.*) In contrast, District's materials do not seek to recruit individuals or organizations to campaign for Measure V, and do not contain the types of campaign tools included in the *Keller* packet.

Finally, plaintiff notes the *Vargas* court's reference to the "promotional campaign brochure[s]" mailed to voters by the Solano Transportation Improvement Authority in connection with a local transportation measure.[10] (See *Vargas, supra,* 46 Cal.4th at p. 39 & fn. 21.) Contrary to plaintiff's suggestion, the tone and appearance of the Solano documents are much more

---

[9] Plaintiff argues statements on Singer's Web site (describing its work on Measure V as a "public information campaign" seeking "to approve" the agreement) establish the publications were "professional political ads." As noted, the consultants' subjective views (if they could be gleaned from the Web site) do not establish District's mailers, "[v]iewed from the perspective of an objective observer," are improper campaign materials. (*Vargas, supra,* 46 Cal.4th at p. 38.)

[10] The *Vargas* court took judicial notice of the Solano brochures. (*Vargas, supra,* 46 Cal.4th at p. 39, fn. 21.) We also take judicial notice of the brochures, which plaintiff submitted to the trial court, and which the parties discuss in their briefs.

inflammatory and emotional than District's materials. For example, the Solano brochures include large photographs of traffic collisions, blown-up headlines about fatal accidents, and a headline stating dangerous roads "threaten all of us."

### d. *Timing*

In *Keller*, after noting the State Bar distributed its material approximately one month before the judicial retention election, the Supreme Court found the packet improper based on this and other factors, including the type of material involved and its style and tenor. (See *Keller, supra*, 47 Cal.3d at p. 1172.) In *Vargas*, the court noted the City of Salinas mailed its newsletter to all city residents on or before October 1, 2002, approximately one month before the November 5, 2002 election. (See *Vargas, supra*, 46 Cal.4th at pp. 12–13, 35.) The Supreme Court considered the timing of the publication in conjunction with other factors, such as the regularity of the newsletter, its style and tenor, and the appropriateness of the subject matter for inclusion in the newsletter. (*Id.* at pp. 38–39.)

District, like the public entities in *Keller* and *Vargas*, sent its materials shortly before the election. District sent its newsletter on or about July 17, 2006, the first postcard on or about July 27, and the second and third postcards in early August. The election date set for the mail-in only election on Measure V was August 29, 2006. This was the date approved by the Board when it called for the election, and the date listed on the San Mateo County Elections Web site pages setting forth the text of Measure V and the election results. In addressing the timing issue, District accordingly focuses on how far in advance of the August 29 election date each mailer was sent, i.e., 43, 33, 25, and 22 days.

Plaintiff suggests a different calculation should apply. According to Board minutes, county election officials planned to mail ballots to residents on or about July 29, with a return deadline of August 29. Plaintiff thus states the election was scheduled to "begin" on July 29, and characterizes District's mailings as occurring either very shortly before or "during" the election period.[11]

We need not determine whether the circumstance that the election on Measure V was mail-in only is a basis for treating District's mailings as

---

[11] Plaintiff contrasts this schedule with the Salinas newsletter in *Vargas*, which plaintiff states was sent "at least five weeks before the election." It is unclear whether this comparison is appropriate, because some Salinas residents may have used absentee ballots (and thus may have received and returned their ballots prior to the election date), a point not discussed in the *Vargas* decision. (See Elec. Code, § 3003 [vote by mail ballot available to any registered voter]; Elec. Code, former § 3003 [absentee ballot available to any registered voter].)

occurring closer to the election than if that election had included both in-person and mail-in voting, and we need not determine the exact dates on which the mailers were sent. We conclude, as the Supreme Court did in *Vargas*, that the timing of the mailers is not dispositive. Instead, as in *Vargas*, a number of factors support the conclusion that District's mailing of the newsletter and postcards constituted informational rather than campaign activity. (See *Vargas, supra,* 46 Cal.4th at p. 38.) These factors include the tone and content of the communications, as discussed in parts II.D.2.a. and II.D.2.c. above. (See *Vargas,* at pp. 38–39.) Also significant is the fact that District's newsletter and postcards were part of a long-term effort by District to provide residents with information about the proposed new hospital. (See *id.* at p. 38 [regular edition of city newsletter]; *DiQuisto, supra,* 181 Cal.App.4th at p. 273 [" 'e-mail blast' " sent as part of "a series of regular communications" to recipients in database].) This effort included three previous newsletters, as well as numerous public meetings and other communications.

Plaintiff contends District's newsletter is unlike the municipal newsletter in *Vargas*, because District did not publish its newsletter with sufficient regularity, and because District's newsletters focused mostly on the hospital project rather than on a wider variety of topics. (See *Vargas, supra,* 46 Cal.4th at pp. 48–55.) While District did not publish its newsletter on a fixed schedule, it still is significant that the summer 2006 newsletter was part of a larger series of communications with residents. (See *DiQuisto, supra,* 181 Cal.App.4th at p. 273.) District did not suddenly begin communicating about the proposed hospital on the eve of the election. As to the scope of topics covered, although District's prior newsletters focused primarily on the hospital project, some of them addressed other topics as well, such as District's grant program and District's background and current responsibilities. In any event, the newsletters' focus on the proposed new hospital does not establish they were not an ongoing series of communications with District residents. We consider the challenged publications in the context of those communications.[12]

▮ After considering the above factors, we conclude District's materials, while differing in some respects from the materials at issue in *Vargas*, constitute informational materials as a matter of law.

---

[12] In connection with its timing argument, plaintiff cites *SBCAG*, in which the appellate court held a county transportation authority's sponsorship of a ballot measure did not constitute improper electoral advocacy, in part because the activities occurred *before* the measure qualified for the ballot. (*SBCAG, supra,* 167 Cal.App.4th at pp. 1234–1235, 1238–1241; accord, *Fleming, supra,* 191 Cal.App.4th at p. 98.) The *SBCAG* court did not hold all government communications about a measure *after* it qualifies for the ballot are improper. Instead, the court must evaluate such communications in light of the relevant *Stanson* factors. (See *Vargas, supra,* 46 Cal.4th at pp. 33–34, 37–40.)

## III. DISPOSITION

The trial court's order denying District's anti-SLAPP motion is reversed. The matter is remanded with directions to enter an order granting the motion to strike and dismissing the action. District shall recover its costs on appeal.

McGuiness, P. J., and Pollak, J., concurred.

## APPENDIX

COMMUNITY UPDATE

Dear District Resident,

The Peninsula Health Care District (the District) Board is proud to announce that after many years of study and planning, we are ready to present our agreement to build a new community hospital to the District voters in a special mail-in ballot election this August.

Last fall, the District Board unanimously approved an agreement with Mills-Peninsula Health Services (MPHS), the current operator of Peninsula Medical Center, to build a new $488 million modern medical campus on District land with no new taxes. As part of this new lease, MPHS will pay $1.5 million a year to the District in rent for use of that land for the 50-year term of the lease, after which time the hospital will be transferred back to the District. The District will reimburse MPHS with the book value of the new hospital, a substantial discount, at the time of this transfer.

Because the current hospital does not meet newly adopted, state-mandated seismic safety requirements, which must be met by 2013, the District Board is eager to present this agreement to the District voters for approval in order to avoid further cost escalation and to keep construction on budget and on schedule. If the new seismic standards are not met by the deadline and a new medical facility is not built, the Peninsula Medical Center would be forced to shut down, greatly limiting access to quality health care in our community.

We would like to thank all of you who took the time to attend our special Board meetings which were held throughout the District and to those of you who provided feedback on the draft agreement this past fall.

The negotiations have been extensive and with your input and participation, we have negotiated the best possible agreement for the District. We will get a new hospital, and a framework for providing for the health care needs of the people of the District for generations to come.

Sincerely,
The Peninsula Health Care District Board

## PHCD
**Peninsula Health Care District**

1783 El Camino Real
Burlingame, California 94010
(650) 696-5450
info@peninsulahealthcaredistrict.org

PRSRT STD
U.S POSTAGE
**PAID**
SAN FRANCISCO, CA
PERMIT NO. 11882

1

Appendix A

# The Details of the Agreement

*[text illegible]*

After years of study and public input, the District Board and MPHS came to an agreement on the terms to restructure their relationship. In order to solicit public input on these new terms, the District Board held over 100 public meetings to review the draft agreement, including six special meetings held throughout the District last fall. The terms for the agreement have greatly benefited from the public's response, and the final terms have been modified based on the feedback received from the community and elected officials.

The District Board is proud of the final terms of the agreement, which ensure:

- MPHS will build a new, privately funded (with no new taxes), $488 million modern medical campus at the El Camino/Trousdale site that meets seismic safety standards

- MPHS will pay the District $1.5 million annually in rent (adjusted using COLA) for the 50-year term of the lease

- The community will have a state-of-the-art medical facility that will include modern medical equipment and technology in order to improve the quality of health care for our community

- The District will have more oversight over the new hospital operations than it does under the current lease agreement, including oversight of any proposal to terminate core services such as obstetrics and surgery, ensuring that vital services are offered within the District, not somewhere else

- MPHS will transfer back to the District six properties including: 1730 Marco Polo Way, 1515 Trousdale Drive (land only), 1811 Trousdale, 1791 El Camino Real and 1618-50 El Camino Real, settling a long standing legal dispute regarding the 1985 merger

- The District will receive $6 million from MPHS for the District's 50 percent interest of the medical office building at 1720 El Camino Real

- The hospital will be transferred back to the District at the end of the 50-year lease (subject to book value reimbursement)

This is a fair deal that builds a new public hospital with private funding and also yields vital revenue to the District to ensure the hospital's future and allocate funding to community programs that improve the health of District residents through our Community Grants program.

The first monthly rent payment to the District by MPHS was received at the time of groundbreaking on the new parking lot in October of 2005.

## 1947

San Mateo County residents voted to create *[text illegible]* a tax-free written bonds *[text illegible]* and or emergency *[text illegible]* County

*[text illegible]* of construction, the Peninsula Hospital and Convalescent House Hospital built primarily through taxpayer support *[text illegible]* Opened a staff of 275 *[text illegible]* physicians on staff *[text illegible]*

## 1960

Peninsula Hospital changed its name to Peninsula Hospital and Medical Center

*[text illegible]* Cardiovascular Surgery program at the hospital through collaboration with the University of California, San Francisco.

## 1979

*[text illegible]*

Appendix A

# CONSTRUCTION TIMELINE

3

Appendix A

Appendix A

# NEW HOSPITAL FOR THE NEXT CENTURY

## THE NEW HOSPITAL CAMPUS WILL FEATURE:

A six-story, 450,000 square foot general care hospital, including an unfinished floor for future expansion

A 145,000 square foot office building adjacent to the new hospital for administrative personnel and hospital-oriented specialty physicians, allowing specialists to be more immediately accessible to patients in the hospital and ER, thereby improving access and quality of care

Advanced engineering technology, which will provide the highest level of seismic safety in the new facility

243 beds with all private rooms—except for behavioral health rooms, where socialization benefits of two-bed rooms is preferred, and in the neonatal intensive care unit (NICU)

Family sleeping accommodations in all medical/surgical, skilled nursing, obstetric, intensive care and neonatal intensive care patient rooms

A first-floor design that locates the emergency department, operating rooms and imaging services together for optimum efficiency and patient care

Nine meditation and healing gardens with walking trails for patients, visitors, employees and neighbors

No recycled air for improved patient safety

Technologically-advanced facility with electronic patient charting and Internet based capabilities for communication between patients, physicians and family members

An emergency department enlarged by 42 percent to accommodate 50,000 visits per year (up from 35,000 visits) with the capability of providing trauma care

A separate entrance for emergency department vehicles

Helipad

809-car parking garage, plus additional surface parking with level access to the front door of the new hospital

New hospital rendering, courtesy of Mills-Peninsula Health Services

5

Appendix A

*Mail-in only ballots will be sent to registered voters between July 31–August 19.*

This August, District residents will be voting on the new hospital plan submitted by MPHS to replace Peninsula Medical Center in Burlingame.

This is the culmination of a six-year planning process to build a new community hospital with no new taxes. Last fall, following District Board approval, MPHS submitted the new hospital plans to the Office of Statewide Health Planning and Development (OSHPD) for approval.

The District secured MPHS's guarantee that they would not walk away from the hospital project before completion and requested a special August election, paid for by MPHS, in order to bring the agreement before the voters and stay on schedule and within the budget.

The agreement allowed MPHS to defer or eliminate items up to 15% of the

total projected cost to stay within budget. MPHS provided the District with a list of such items, which fell far below the 15% reduction in scope.

**If the District voters approve Measure V in a special August election, construction on the new hospital to replace Peninsula Medical Center will begin in September**

and included the potential removal of conference rooms, business offices three operating rooms, the fitness center and helipad, in addition to the removal of some exterior finishes. (For a complete list of the items, please visit our website at www.peninsulahealthcaredistrict.org)

## How the Mail-In Ballot Works

The San Mateo County Board of Supervisors approved the District's request for the election, which will be presented before the District voters as Measure V on a special mail-in ballot.

District voters will receive their ballots in the mail sometime between July 31 and August 19. On August 14, voter registration closes, so all residents must be registered at their current address prior to that date in order to participate in the special election.

All completed ballots must be returned to the San Mateo County Elections Office by 8 p.m. on August 29, 2006.

As this is a mail-in ballot election, there will not be any polling places. Completed ballots can be mailed back to the Elections Office or delivered to drop box locations, which will be identified when you receive your ballot. For more information on the special

election, please visit the County Elections Office website at www.shapethefuture.org.

The measure will require a majority vote to pass. Upon voter approval, MPHS will begin construction of the new hospital in September.

6

Appendix A

# WHAT IS MEASURE V?

The Peninsula Health Care District (the District Board has come to an agreement with Mills-Peninsula Health Services (MPHS), the operator of Peninsula Medical Center) to build a new hospital on District land. The current hospital must comply with newly adopted state-mandated seismic safety standards or the hospital will be forced to shut down.

This summer, in a special August special mail-in ballot election, District residents will vote on Measure V, the agreement to build a new community hospital.

## MEASURE V WILL ENSURE

* MPHS will build a new private, funded $400 million state-of-the-art modern medical campus on the El Camino Real Peninsula site that meets seismic safety standards—with no new taxes

* In return for the construction of the new hospital, the District will lease its site to MPHS to operate the new hospital for the sum of $1.5 million annually (adjusted using a COLA formula) for the term of 50 years

* The District will improve its oversight over hospital operations with its required approval of the range of services such as obstetrics and surgery—ensuring that vital services are offered within the District—by unweighted also

* At the end of the lease, the hospital will be transferred back to the District, at the District's option, at fair value (substantial discount)

FOR MORE INFORMATION, visit www.peninsulahealthcaredistrict.org
To learn more about the Measure V process visit www.peninsulahealthcaredistrict.org
Office website for election details left the San Mateo County Elections

Appendix B

B-2

Appendix B

# HOW THE MAIL-IN BALLOT WORKS

Once you receive your ballot in the mail, please fill it out and return it to the San Mateo County Elections Office by 8.00 PM on August 29, 2006. There will not be any polling places. Completed ballots can be either returned by mail or delivered to the 24 hour drop box outside of the Elections Office.

C-1

Appendix C

Appendix C

# DON'T FORGET TO VOTE

This is your last chance to vote on Measure V. Completed ballots should be mailed by August 24, 2006 to allow a few days for the ballots to be received. Ballots can also be delivered to the 24-hour drop box outside of the Elections Office by 8 p.m. on August 29, 2006. For more information on completing your ballot, visit www.shapethefuture.org.

* MPHS will build a new privately-funded, $480 million state-of-the-art modern medical campus at the El Camino Real/Trousdale site that meets seismic safety standards — with no new taxes

* In return for the construction of the new hospital, the District will lease its site to MPHS to operate the new hospital for the sum of $1.3 million annually (adjusted using a COLA formula) for the term of 50 years

* The District will improve its oversight over hospital operations with its required approval of the removal of any core services such as obstetrics and surgery, ensuring that vital services are offered within the District — not somewhere else

* At the end of the lease, the hospital will be transferred back to the District, at the District's option, at book value (a substantial discount)

This ad is brought to you by the Mills-Peninsula Health Care District. To learn more about Measure V, the commitment to build a new hospital for the community, or about the District, please go to www.peninsulahealthcaredistrict.org

MEASURE V

AUGUST 29, 2006
BY 8 PM